[Cite as *State v. Cunningham*, 2022-Ohio-3497.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-21-1136

        Appellee                                 Trial Court No.  CR0202001977

v.

Tacarie Cunningham                               **DECISION AND JUDGMENT**

        Appellant                                Decided:  September 30, 2022

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio State Public Defender, and
Timothy B. Hackett, Assistant State Public Defender, for appellant.

* * * * *

**MAYLE, J.**

{¶ 1} Appellant, Tacarie Cunningham, appeals the June 11, 2021 judgment of the

Lucas County Court of Common Pleas sentencing him to 15 years to life in prison.  For

the following reasons, we affirm.

**I.        Background and Facts**

{¶ 2} Cunningham's conviction in this case arose from the shooting death of C.C.

on March 15, 2020.  Cunningham, who was 15 years old at the time, was initially charged

in the Lucas County Court of Common Pleas, Juvenile Division ("juvenile court"), with complaints alleging felony murder in violation of R.C. 2903.02(B), an unclassified felony if committed by an adult; felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony if committed by an adult; and tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony if committed by an adult. The felony murder and felonious assault complaints each included a specification under R.C. 2941.145 alleging that Cunningham had a firearm on or about his person while committing the offense and used it to facilitate the offense.

### A. Juvenile court proceedings

### 1. Probable cause hearing

{¶ 3} On March 31, 2020, the state moved under R.C. 2152.10(B) and 2152.12(B) to have Cunningham's case transferred to the General Division of the Lucas County Court of Common Pleas ("trial court"). On May 6, 2020, the juvenile court held a hearing to determine if there was probable cause to believe that Cunningham had committed felony murder, felonious assault, and tampering with evidence. The state presented the testimony of two detectives from the Toledo Police Department ("TPD"), Jason Mussery and Robert Bascone.

{¶ 4} Mussery testified that he was on call the morning of March 15, 2020, when he received a report of a shooting homicide at an after-hours bar on West Sylvania in Toledo. When he arrived at the bar, Mussery individually interviewed the seven witnesses who were detained by TPD officers. Although he did not remember the name

2

of each witness, Mussery said that "all of them gave the same story as far as there was a scuffle or something happening in the patio area in the back of the bar before they heard a shot."

{¶ 5} Mussery said that the bar had "two DVR systems" with video footage that officers downloaded pursuant to a search warrant. The state played the video during Mussery's testimony.[1] Mussery said that the footage showed a group of people, including C.C. and Cunningham, by the door from the patio to the bar. The state also showed Mussery state's exhibit No. 1, which was a printout of a frame from the video with one person circled. Mussery identified Cunningham as the person circled in the photograph.

{¶ 6} Returning to the video, Mussery described "a scuffle at the door." He said, "You can't see what's happening. [Cunningham] goes towards the door, and it appears that there is a scuffle. I don't know if he was pushed away from the door, but as he backs away from it, he pulls a gun out of his sweatshirt and he fires." About a minute after firing the gun, Cunningham reenters the patio area, reaches down, and picks up something. Based on his training and experience, where Cunningham was standing when he fired the gun, where Cunningham picked up the object, and the fact that police did not find shell casings at the scene, Mussery concluded that Cunningham returned to the patio area to pick up shell casings.

---

[1] The state did not offer the video that it played during the probable cause hearing as an exhibit, and the video is not included in the appellate record.

3

**{¶ 7}** Mussery learned the shooter's identity from other officers before he watched the surveillance video. They identified him as Cunningham. After watching the video and learning that Cunningham was 15 years old, Mussery filed delinquency complaints against Cunningham alleging felony murder with a gun specification, felonious assault with a gun specification, and tampering with evidence. Mussery said that the tampering complaint related to Cunningham removing shell casings from the crime scene. He explained that shell casings are "very important because that's how you link a crime to a gun, and if you don't have shell casings, you can't do that."

**{¶ 8}** At the time of the probable cause hearing, an autopsy had been conducted on C.C., but the report was not yet ready. However, speaking as the lead investigator in the case, Mussery said that C.C.'s cause of death was "[d]eath by gunfire."

**{¶ 9}** On cross-examination, Mussery clarified that, although C.C. was outside on the patio before the shooting, he was found on a set of steps inside the bar—not in the patio area. Mussery claimed that there was no video from that area of the interior of the bar.

**{¶ 10}** Mussery also said that police had not found the gun that they believed was used in the shooting. However, while reviewing the video, Mussery saw "several guns" in the patio area of the bar that night, including a gun that defense counsel characterized as an "assault rifle" that police later found in a backpack. Mussery did not know the caliber of the gun in the backpack or the caliber of the gun used to kill C.C. He did not see Cunningham with a backpack at any point.

4

{¶ 11} Before the shooting, a man who was on the patio had a gun in his hand that he put down. When he did so, another man came over and picked it up. The second man then walked into the bar with the gun. Mussery did not know the caliber of this gun or if it matched the caliber of the gun that killed C.C.

{¶ 12} While closely reviewing the video footage, Mussery acknowledged that Cunningham had his left hand out of his pocket and did not have a gun shortly before the shooting. Cunningham was also one of the people who was pushed back from the door leading into the bar just before the shooting. Mussery agreed that it was possible that Cunningham dropped something from his pockets when he was pushed and that he returned to the patio after the shooting to pick up his personal property—not something with evidentiary value. However, although he could not see on the video exactly what Cunningham picked up, Mussery said that he "think[s] it's highly unlikely" that the item was Cunningham's personal property. Mussery also acknowledged that, after the shooting happened, several people walked back and forth through the patio area and people who were not there at the time of the shooting walked into the bar through the patio area. He did not see any of these people "bend down to the floor[,]" so he did not think that any of them could have picked up a shell casing as they walked through.

{¶ 13} Mussery could not tell from the video how many shots were fired, but based on the accounts that he gathered from the witnesses—whom Mussery described as "about 50 percent cooperative"—he believed that there were two shots. He also believed that Cunningham was the person who fired the shots based on what he saw in the video,

5

despite knowing that another handgun was in the bar less than three minutes before C.C. was shot. As Mussery clarified on redirect, this was because Cunningham was the only person who was visible in any portion of the surveillance video pointing a gun at someone or firing a gun. But he conceded that there was no video of the interior of the bar, so he had no way of knowing if someone inside the bar pointed a gun at C.C.

{¶ 14} The state's other witness at the probable cause hearing was Bascone, a detective with the TPD's gang unit. Following C.C.'s shooting, someone from TPD's detective bureau sent the picture in state's exhibit No. 1 to the gang unit to see if they could identify the person circled in the picture. Bascone was able to identify the person as Cunningham "[r]ight away" and did not have any doubts about his identification.

{¶ 15} After hearing the testimony, the juvenile court said that the standard for probable cause required it to find that there was credible evidence supporting every element of each offense and "whether its [sic] more likely than not that these offenses were committed and that they were committed by Tacarie." In finding probable cause, the court explained

> What I see is Tacarie shooting in the direction of where the victim was. I know that [C.C.] died. Everybody stipulated that there was a murder, that he was shot to death. There were no shell casings, and yet there should have at least been a shell casing either where the victim was found if someone inside the club killed him, or where Tacarie was and there's none either way. But we saw Tacarie bend down to pick something

6

up. I think that it's more likely than not that not only was this murder—not only this murder happened but that Tacarie Cunningham did it. Now, again, that's not proof beyond a reasonable doubt. All I need to make a finding is that it's more likely than not that that's what happened, and I do make that finding.

{¶ 16} Because Cunningham's transfer to the trial court was discretionary under R.C. 2152.12, the trial court ordered the required evaluations and amenability hearing before determining whether to transfer jurisdiction of Cunningham's case.

## 2. Amenability hearing

{¶ 17} On August 4, 2020, the juvenile court held a hearing to determine if Cunningham was amenable to care or rehabilitation in the juvenile system, and if the safety of the community required that Cunningham be subject to adult sanctions, as required by R.C. 2152.12(B). At the hearing, the state presented the testimony of Dr. Thomas Sherman, a psychiatrist, and Mussery.

{¶ 18} Sherman testified that he is the medical director at Court Diagnostic and Treatment Center, and that he evaluated Cunningham for purposes of the amenability hearing. When he conducts these evaluations, he looks at whether the child has a mental illness or mental defect, the child's maturity level, and whether the child is amenable to rehabilitation in the juvenile system.

{¶ 19} Sherman described Cunningham as a "nice kid" who was polite and did not show signs of serious mental illness. He thought that Cunningham "wasn't very upfront"

7

and "was kind of vague in providing details[,]" but "[o]ther than that, nothing else was peculiar."

{¶ 20} Regarding mental illness, Sherman said that Cunningham had attention deficit hyperactivity disorder, which is a mental illness, but "in terms of forensic evaluations, mental illness translates to either severe depression, bipolar disorder or some sort of psychotic disorder."

{¶ 21} When he considers a child's maturity, Sherman is "looking for [] gross immaturity rather than maturity. * * * [W]hat interested me most is whether or not I'm dealing with a kid or an adult." Sherman did not think that he was "dealing with" a kid when it came to Cunningham. He said that Cunningham "certainly did not appear to be living the life of a typical 15-year old [sic]. * * * He traveled around. He went to Dayton by himself. He was hanging out in the middle of the night."

{¶ 22} Finally, regarding rehabilitation in the juvenile system, Sherman said that asking him to "foretell the future" was a "difficult question." He explained that, at 15 years old, Cunningham could spend six years at a Department of Youth Services ("DYS") facility, and that "[a] lot can happen in six years." However, "[w]hat [Sherman] worried about most in this case was the nature of the offense. It sounded to [Sherman] as if it were just cold blooded, and [Cunningham] denied it. There was no remorse." Sherman referred to the video of a police interview with Cunningham that Sherman watched as part of his evaluation. When the detective presented Cunningham with video evidence of Cunningham with the gun in his hand, Cunningham "denied doing it."

8

Sherman said that he was "not here to make a judgment whether or not [Cunningham] did do it, but if he did, that certainly doesn't sound real good."

{¶ 23} Sherman went on to explain what he called the "Sherman rule": "if [in] the best of all worlds and price were no object and insurance covered everything, could I, in six years, make a big difference if I were treating him personally? In this case I doubt it, but, again, if he were a captive citizen, maybe I could." Sherman reiterated that predicting future outcomes is a "very difficult thing to determine."

{¶ 24} Additionally, Sherman learned of a report that Cunningham had put a post on Facebook that included the "the presentation of the victim as a trophy * * *." If Cunningham had, in fact, made such a post, Sherman said that it "certainly suggests to [him] a lack of remorse, a lack of ability to put yourself in another person's position * * *. Those are indications * * * of an incipient antisocial character which would make it almost beyond the realm of treatment, certainly beyond the realm of treatment with the current situation of DYS."

{¶ 25} In reaching his conclusion, Sherman considered the potentially unreliable report about the Facebook post and its contents, the lack of remorse that he saw in Cunningham's police interview, Cunningham's relatively minor juvenile record before this case, and Cunningham's age. Cunningham's case was "not an easy call," but Sherman ultimately decided that, "if [Cunningham] did this [crime] and if the facts that I have in front of me are true, that's not a good prognosis for long-term treatment. But,

9

again, you know, we're talking six years." Sherman admitted that "up until the time of the offense [Cunningham] clearly would fit a DYS transfer, but this is a different story."

{¶ 26} On cross-examination, Sherman acknowledged that Cunningham's only prior juvenile adjudication was for criminal trespass, and that he believed that Cunningham was amenable to juvenile court sanctions for that offense. Sherman went on to say that "if this were some other kind of offense, armed robbery for example, I would probably say that [Cunningham] could still be amenable to treatment. It's the nature of this offense that really swung the balance for me."

{¶ 27} Sherman also admitted that what he perceived as Cunningham's lack of remorse could have been the result of other factors, such as Cunningham being adamant that he had not committed the offenses and naturally being guarded because he was facing serious charges and had never met Sherman.

{¶ 28} Regarding Cunningham's maturity, Sherman agreed that Cunningham, at 15, lacked a full understanding of the consequences of the court proceedings and the nature of his involvement with Sherman because "[t]here is a great deal of naivete that comes with 15-year olds [sic] no matter what kind of lifestyle they have." Although the way that Cunningham was described in some of his school documents—impulsive, talking about inappropriate topics, fighting, having difficulty with interpersonal relationships—could show youthful immaturity, Sherman also said that they "could be describing the worst psychopath at the age of 25 * * *."

10

**{¶ 29}** Consistent with his testimony, Sherman's report, which the state offered into evidence, said that Cunningham provided generalities and vague information in response to Sherman's questions. In the history section, Cunningham reported that he was raised by his mother and had five half-siblings whose exact ages he did not know. He was a Toledo native, and had moved around a lot, but could not remember how many addresses he had lived at or schools he had attended. He was unsure of what school he would be attending if he were not in detention, but said he would be in tenth grade. He also reported his ADHD diagnosis and said that he had taken medicine for it in the past, although he was not taking it at the time of his meeting with Sherman. He said that he uses marijuana because it makes him less hyper, but did not drink alcohol. Cunningham reported having a girlfriend, who was also 15 and was pregnant.

**{¶ 30}** In the evaluation section, Sherman noted that Cunningham was pleasant and friendly, despite giving vague and sometimes evasive answers. He said that Cunningham "was always emphasizing the fact that he has 'turned the corner' in his life, even though he continued to deny any participation in this offense." Cunningham was logical and oriented, and did not display characteristics of major mental disorders, signs of depression or anxiety, abnormal or peculiar affect, or evidence of serious intellectual incapacity, neurocognitive deficits, or memory problems.

**{¶ 31}** In reaching his conclusion about Cunningham's amenability to treatment, Sherman wrote that "[u]p until the time of the [underlying offenses], there appeared to be no indication that he is a recidivistic criminal or antisocial personality. The nature of this

11

offense, however, (if indeed he committed it) is a cause of serious concern in terms of future amenability." If Cunningham were involved in the shooting, "he was the lone actor and did not appear to be demonstrating any remorse denying the fact that he even participated in the offense despite evidence apparently to the contrary." Sherman went on to explain that Cunningham's lifestyle at the time of the shooting "certainly does not indicate he was an 'average' 15-year-old." Cunningham admitted to being at an after-hours bar, but said that he could not remember what he was doing there; he claimed that he just decided to go. Sherman also noted that Cunningham did not seem to have many friends or close relationships.

{¶ 32} Taking all of these things into consideration, and based on the statutory factors regarding transfer to the adult court, Sherman made three conclusions: (1) there was no evidence that Cunningham suffered from a significant mental illness or defect; (2) there was no evidence of "glaring immaturity and childlike behavior that would mitigate against a transfer * * *"; and (3) the answer to the question of amenability depended upon whether Cunningham actually committed the crimes he was accused of.

{¶ 33} Specifically regarding the third conclusion, Sherman said that

If indeed [Cunningham] was the lone actor and the lone "shooter", it would appear that the matter speaks for itself. The situation would be even more serious if indeed he did put a Facebook post out advertising the victim as a "trophy". It appears as though he was living in what could best be described as a "criminal environment". There appeared to be no stability,

12

moving from school to school, home to home and apparently thinking nothing of the fact that there were serious contrabands found in the house where he was living [sic].

[] If on the other hand he was not a participant in the offense and based upon his age, it would appear there would be no absolute contraindications to him being kept in the juvenile system.

{¶ 34} The other witness that the state called at the amenability hearing was Mussery. First, he testified about identifying Cunningham as the suspect in this case. Although he identified the suspected shooter from the surveillance video, he did not know the shooter's name. Before he identified Cunningham as the person in the video, he received an anonymous tip that the shooter was "very young and that they were in a gang[,]" specifically the "Rec Squad [sic]" gang. Mussery eventually learned Cunningham's name from the gang unit of the TPD. Because of prior interactions with Cunningham, "[t]he entire unit" was able to identify Cunningham from the photograph in state's exhibit No. 1, and they knew that he was affiliated with the RECC Squad gang. Mussery did not have any personal knowledge that Cunningham was in a gang.

{¶ 35} A couple of days after the shooting, Mussery received another anonymous tip. This caller said that a Facebook page had "a post about the victim of the shooting being a trophy[,]" and that the post had already been taken down. When Mussery looked up the Facebook page, he did not see a post about the victim, but he saw that the page

13

belonged to Cunningham, despite the page being listed under a name that was not "Tacarie Cunningham."

{¶ 36} According to Mussery, the only evidence that Cunningham knew C.C. came from Cunningham saying during his interview that he knew who C.C. was, but "they had no problems with each other or anything." Based on what he could see in the video, Mussery said that there appeared to be a dispute between other parties right before the shooting happened, but that neither Cunningham nor C.C. was involved.

{¶ 37} Mussery was not able to discern a motive for the shooting in this case. He said that, based on the video, "there doesn't appear to be any reason to pull a gun and shoot someone. * * * [Cunningham] wasn't in any mortal danger." Mussery also observed that "in the moments leading up to the shooting if you watch the video, [Cunningham] has a smile on his face the whole time. And most of the video, prior to the shooting he has his hand in his pocket" that he later pulls the gun from. Mussery did not come across anyone who had a grudge against C.C. and would want to kill him or find any evidence that any of the adults at the bar that night had encouraged Cunningham to shoot C.C.

{¶ 38} On cross, Mussery said that the only thing he did to verify the anonymous tip about the Facebook page was call the phone number back, but the person did not want to provide their name. He said that he "didn't give [the tip] any weight at all. I put it in my report." Mussery acknowledged that he never saw the post that the caller referred to, and that he could not try to subpoena Facebook for a post that had been taken down. He

14

also acknowledged that the name on the Facebook page was not Cunningham's name, that anyone could post pictures of Cunningham and make a page appear to belong to him, and that he "[t]echnically" could not verify that the page belonged to Cunningham. However, he believed the page was Cunningham's based on the person's friends, who also had pictures of Cunningham on their pages, and a reference to the name on the Facebook page that police found when they executed a search warrant at one of Cunningham's former residences. Mussery clarified on redirect that the initials "YTM" were part of the name on the Facebook page and were also "carved on the porch of an address that [Cunningham] has previously used[,]" which was vacant at the time TPD officers searched it.

{¶ 39} The last piece of evidence that the juvenile court considered was Cunningham's social history, compiled as required by R.C. 2152.12(C). The probation officer who created the report gathered information from Cunningham and his mother. Mother reported that she and her family were residing in Dayton at the time of the shooting, and Cunningham somehow made his way back to Toledo. Cunningham admitted to coming to Toledo without mother's consent and said that he was staying with family members. Neither one was clear on how long Cunningham was in Toledo, but they said that he returned to Dayton after the shooting. Mother also said that getting Cunningham to follow his curfew was an ongoing problem, and she was concerned that he did not fully understand the nature of the offenses he was accused of.

15

{¶ 40} Cunningham reported not having any close friends, but having a few friends he regularly spent time with.  He had one friend who had been in trouble with the law and one who was involved with a gang.  Cunningham denied being involved with any gangs.

{¶ 41} The last record of Cunningham attending school before the March 2020 shooting was in January 2020, in Monroe, Michigan, where the family was living at the time.  He was in eighth grade.  According to the school records, Cunningham was suspended in late January because he came to school smelling like marijuana and admitted to being high.  He did not return to school after the suspension.  The school noted a "Law Enforcement Truancy Referral" on Cunningham's record, and listed the reason that Cunningham was withdrawn from the school as "[u]nable to locate." Cunningham's grade cards from sixth and seventh grades, when he attended Toledo Public Schools ("TPS"), show chronic absenteeism and generally poor grades, with his grade point average for each year falling below 1.0.  Cunningham had an individualized education plan ("IEP") when he was at TPS.  The evaluations done for the IEP showed that Cunningham's general intelligence level was in the borderline-low range compared to peers his age, his academic functioning was significantly below his grade level, and he had behavioral problems that were severe enough to require his placement at schools for children with behavioral problems.  Cunningham struggled with impulsivity, was seen kicking other students, throwing objects, and being in other people's personal space, and

had trouble attending to tasks and putting forth the effort required to improve his academic performance.

{¶ 42} Cunningham had received mental health services and treatment for ADHD in the past, but was not prescribed any medicine or under the care of a doctor at the time of the social history. He reported that his drug of choice was marijuana, but he had not used it in the past 30 days because he had been in the detention center. Mother said that Cunningham's drug use was a problem, but he had not participated in any drug treatment services.

{¶ 43} Based on the information available to the probation officer who compiled the social history, the officer determined that Cunningham "did not display the ability to recognized high risk situations." The officer noted that Cunningham admitted to driving a stolen car without a license, selling drugs, and violating his curfew, which supported the officer's conclusion that Cunningham "did not display the ability to weigh the pros and cons to specific situations" and "did not display a pattern for making pro-social decisions." He acknowledged that "his poor decision has placed him into this predicament[,]" but was "confident that the truth will come out in court." The probation officer also noted that Cunningham expressed empathy for C.C.'s family and shared how his actions impacted his own family.

{¶ 44} After hearing the testimony and evidence at the amenability hearing, the juvenile court determined that Cunningham's case should be transferred to the trial court. In explaining its reasoning, the court said,

17

[T]his is very difficult for me as a judge, as a person, as a parent. I've been on the bench about—over 13 years now here, and I do not recall any other murder cases involving a 15-year old [sic]—or I should say a discretionary [transfer] murder * * * where the murder occurred for no apparent reason. * * *

This case really bothers me, Tacarie. Because I saw the video, and I found that it's probable that you killed this guy. And for purposes of today's hearing, I have to assume guilt because I made a probable cause finding. Every section—every factor that's considered for or against transfer requires that I assume guilt. If I didn't, we wouldn't be here.

* * * The statute says it's not just about whether there's time for rehabilitation. The statute [R.C.] 2152.12(B) states that the child is not amenable within the juvenile system and the safety of the community requires the child to be subject to adult sanctions, of those are the two factors that I have to decide. * * *

The factors against that decision are (E) (5), that he has previously not been adjudicated a delinquent child. That's true. And the other factor against transfer is that there are six years within which to give him services.

The factors in favor of transfer are that the victim died. That's subsection (1). Subsection (5) that he—that Tacarie had a firearm on him, and that for purposes of today I assume he killed him. And (8), the child is

emotionally, physically or psychologically mature enough for the transfer. If he were six months older, he would have been a mandatory transfer. And I'm not saying that's the basis of my decision. But I understand what Dr. Sherman was saying when he said if he's guilty of this, then it doesn't matter that there are six years left. There's actually not six years left. There's about five. But it doesn't matter because this is such a cold blooded act, assuming that this—that he did this. It is cold blooded with no apparent motive, and I do think that there is a connection between him being identified by every member of the gang unit and this murder. Do I think that he had a beef with the victim, I have no idea. Nobody does. But I almost wish he had. That would give me some reason for this murder. And I think what bothers me the most about this is in 13 years on the bench I have never seen anybody just kill somebody without any reason to do it, much less a 15-year old [sic]. So in considering those factors, there are more factors in favor of transfer than against it. But in addition, I don't think that Tacarie is amenable to treatment or care, rehabilitation in the juvenile justice system. And I do think that the community needs to be protected from him. * * *

The court went on to say that it thought that "there is a chance that [Cunningham] will end up being found not guilty * * *" in the trial court because "[t]here are some good arguments when you're looking at [proof] beyond a reasonable doubt, * * *" but for

purposes of determining whether Cunningham's case should be transferred, the court "thought there was plenty of evidence to show that this was just a cold blooded murder for no apparent reason, and that is really a scary thing."

### 3. Transfer decision

{¶ 45} On August 7, 2020, the juvenile court filed a judgment entry transferring jurisdiction to the trial court. The juvenile court determined that (1) Cunningham was charged with delinquency by reason of committing acts that would be felonies if committed by an adult; (2) probable cause was found to believe that Cunningham committed the acts he was charged with; (3) Cunningham was 15 years old at the time of the offense; and (4) a medical examination, social history investigation, and mental evaluation were completed and considered, as required by R.C. 2152.12(C) and Juv.R. 30. The court reiterated that it was required to determine whether Cunningham was amenable to care and rehabilitation in the juvenile system and whether the safety of the community may require that Cunningham be subject to adult sanctions.

{¶ 46} After considering the factors in R.C. 2152.12(D) and (E), the juvenile court said that it was

> clearly convinced that factors in favor of transfer, [R.C.] 2152.12 (D), (1), (5), and (8), outweigh factors against transfer, [R.C.] 2152.12 (E) (5) and (8) [sic]. Although this youth would be in the juvenile system for 5 more years, it is not the amount of time but rather the nature of this crime

that leads this Court to believe he would not be amenable to treatment within that period of time.

## B. Trial court proceedings

{¶ 47} Following the juvenile court's transfer of jurisdiction, Cunningham was indicted on one count each of felony murder in violation of R.C. 2903.02(B), an unclassified felony; felonious assault in violation of R.C. 2903.11(A)(2), a second-degree felony; and tampering with evidence in violation of R.C. 2921.12(A)(1), a third-degree felony. The felony murder and felonious assault charges each included a firearm specification under R.C. 2941.145.

{¶ 48} Cunningham eventually entered a guilty plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), to the felony murder charge. In exchange, the state agreed to dismiss the firearm specification attached to the murder charge and the remaining charges in the indictment. At the plea hearing, the trial court found Cunningham guilty of felony murder.

{¶ 49} At the sentencing hearing, the trial court imposed a definite prison term of 15 years to life, with parole eligibility after 15 years, and ordered Cunningham to register with the violent offender database upon his release from prison.

## C. Appeal

{¶ 50} Cunningham now appeals, raising seven assignments of error:

Assignment of Error I: The juvenile court violated Tacarie's right to due process, fundamental fairness, and the presumption of innocence when

21

it determined that Tacarie was guilty of the offenses charged for the purpose of finding that he was not amenable to treatment in the juvenile system.

Assignment of Error II: The trial court abused its discretion and violated due process when it found that Tacarie was not amenable to treatment when the government did not present clear and convincing evidence to support this claim.

Assignment of Error III: Without a clear standard of proof, R.C. 2152.12(B) violates a child's right to procedural due process and fairness.

Assignment of Error IV: The juvenile court violated Tacarie's right to due process and abused its discretion when it failed to weigh all dispositional options provided by statute, including a serious youthful offender disposition.

Assignment of Error V: The juvenile court erred when it found probable cause despite the absence of credible evidence.

Assignment of Error VI: Alternatively, the "more than a mere suspicion" standard used in probable cause hearings violated Tacarie's right to procedural due process in transfer proceedings.

Assignment of Error VII: Tacarie was deprived of his right to the effective assistance of counsel.

## II.    Law and Analysis

{¶ 51} In his assignments of error, Cunningham argues, broadly, that the juvenile court's probable cause and amenability determinations were not supported by sufficient, credible evidence; the standard of proof that the court used for the probable cause determination and the lack of a clear standard of proof in R.C. 2152.12(B) violate his procedural due process rights; the court violated his due process rights by presuming his guilt and failing to weigh the possibility of a serious youthful offender ("SYO") disposition during the amenability hearing; and he received ineffective assistance of counsel. For ease of discussion, we address his arguments out of order.

## A. Juvenile transfer law

{¶ 52} Before addressing Cunningham's assignments of error, we first review the law applicable to juvenile bindover hearings.

### 1. Statutory requirements

{¶ 53} The juvenile court has exclusive subject matter jurisdiction over the case of a child who is alleged to be delinquent because he committed acts that would be considered crimes if they were committed by an adult. *State v. Wilson*, 73 Ohio St.3d 40, 43-44, 652 N.E.2d 196 (1995); R.C. 2151.23(A)(1) ("The juvenile court has exclusive original jurisdiction * * * [c]oncerning any child who on or about the date specified in the complaint * * * is alleged * * * to be * * * a delinquent * * * child * * *."); R.C. 2152.02(E)(1) (defining a "[d]elinquent child" as "[a]ny child, except a juvenile traffic offender, who violates any law of this state or the United States, or any ordinance of a political subdivision of the state, that would be an offense if committed by an adult"). In

23

certain cases, however, the juvenile court can transfer jurisdiction over a child's case to the adult court under the procedures outlined in R.C. 2152.10 and 2152.12.

{¶ 54} Because Cunningham was under 16 when the acts alleged in this case occurred, and the acts alleged in the complaints would be felonies if committed by an adult, the juvenile court had discretion to transfer his case to the trial court. R.C. 2152.10(B); R.C. 2152.12(B). To make a discretionary transfer, the juvenile court is required to make three findings: "(1) [t]he child was fourteen years of age or older at the time of the act charged[;] (2) [t]here is probable cause to believe that the child committed the act charged[; and] (3) [t]he child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions." R.C. 2152.12(B)(1)-(3). The juvenile court is also required to "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child * * *." R.C. 2152.12(C).

{¶ 55} To establish probable cause to believe that a juvenile committed an offense, the state must present "credible evidence that 'raises more than a mere suspicion of guilt, but need not provide evidence proving guilt beyond a reasonable doubt.'" *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 10, quoting *State v. Iacona*, 93 Ohio St.3d 83, 93, 752 N.E.2d 937 (2001). While the state is required to present *credible* evidence going to every element of the offense to establish probable cause, the evidence "does not have to be *unassailable*" to qualify as credible. (Emphasis added.) *In re A.J.S.*,

24

120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, ¶ 46, citing *Iacona* at 93, 95; *In re D.M.S.*, 2021-Ohio-1214, 170 N.E.3d 61, ¶ 19 (2d Dist.), citing *In re B.W.*, 2017-Ohio-9220, 103 N.E.3d 266, ¶ 21 (7th Dist.).

{¶ 56} In making its probable cause determination, the juvenile court is required to evaluate the quality of the evidence that the state presents in support of probable cause, as well as any evidence that the juvenile presents attacking probable cause. *Iacona* at 93, citing *Kent v. United States*, 383 U.S. 541, 563, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966). However, the Supreme Court has "expressly limited the [juvenile] court's review of the evidence presented at the bindover hearing * * *" to the narrow issue of probable cause. *A.J.S.* at ¶ 43, citing *Iacona* at 96. That is, "while the juvenile court has a duty to assess the credibility of the evidence and to determine whether the state has presented credible evidence going to each element of the charged offense, it is not permitted to exceed the limited scope of the bindover hearing or to assume the role of the ultimate fact-finder." *Id.* at ¶ 44.

{¶ 57} After finding probable cause, the juvenile court must determine under R.C. 2152.12(B)(3) whether the child is amenable to care or rehabilitation in the juvenile system and whether the safety of the community may require the child to face adult sanctions. To make this decision, the juvenile court is required to determine whether the factors in R.C. 2152.12(D) in favor of transferring jurisdiction "outweigh" the factors in R.C. 2152.12(E) in favor of retaining jurisdiction. As applicable to Cunningham, the R.C. 2152.12(D) factors in favor of transfer are:

25

(1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

* * *

(5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

* * *

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

* * *

And, as applicable to Cunningham, the R.C. 2152.12(E) factors in favor of retaining jurisdiction are:

(5) The child previously has not been adjudicated a delinquent child.

* * *

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 58} When weighing these and any other relevant factors, the juvenile court has wide latitude in determining whether it should retain or relinquish jurisdiction over a

26

juvenile, and its decision will not be reversed absent an abuse of discretion.  *In re D.M.*, 6th Dist. Lucas Nos. L-16-1237, L-16-1238, and L-16-1270, 2017-Ohio-8768, ¶ 35, citing *State v. Ramirez*, 12th Dist. Butler No. CA2010-11-305, 2011-Ohio-6531.  Abuse of discretion means that the juvenile court's decision was unreasonable, arbitrary, or unconscionable.  *State ex rel. Askew v. Goldhart*, 75 Ohio St.3d 608, 610, 665 N.E.2d 200 (1996).  "'As long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors,' a juvenile court's decision to retain or relinquish jurisdiction will be upheld on appeal."  *D.M.* at ¶ 35, quoting *State v. Phillips*, 12th Dist. Clinton No. CA2009-03-001, 2010-Ohio-2711, ¶ 39; *see also State v. Blair*, 5th Dist. Stark No. 2016CA00180, 2017-Ohio-5865, ¶ 30; *State v. West*, 167 Ohio App.3d 598, 2006-Ohio-3518, 856 N.E.2d 285, ¶ 10 (4th Dist.).

{¶ 59} Once the juvenile court decides to transfer jurisdiction, it is required to state on the record its reasons for transferring a case and indicate the specific factors in R.C. 2152.12(D) and (E) that it relied on in making its transfer determination.  R.C. 2152.12(B)(3), (I).

### 2. Constitutional requirements

{¶ 60} Transferring a juvenile's case to adult court also implicates constitutional rights.  Due-process rights are applicable to juveniles through the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.  *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d

27

883, ¶ 23, citing *In re C.S.*, 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 79; *In re Gault*, 387 U.S. 1, 41, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); and *In re C.P.,* 131 Ohio St.3d 513, 2012-Ohio-1446, 967 N.E.2d 729, ¶ 71. Thus, in addition to complying with the statutory requirements in R.C. 2152.12, transfer hearings must also protect a child's due process rights.

{¶ 61} The Ohio Supreme Court has said that "in the context of a juvenile-court proceeding, the term 'due process' '"expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty."'" *Id.*, quoting *C.S.* at ¶ 80, quoting *Lassiter v. Dept. of Social Servs. of Durham Cty., North Carolina*, 452 U.S. 18, 24, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981). Based on the circumstances of the case, "[a] court's task is to ascertain what process is due * * * while being true to the core concept of due process in a juvenile case—to ensure orderliness and fairness." *C.S.* at ¶ 81, citing *McKeiver v. Pennsylvania*, 403 U.S. 528, 541, 91 S.Ct. 1976, 29 L.Ed.2d 647 (1971) (plurality opinion).

{¶ 62} The Ohio Supreme Court, echoing precedent set by the Supreme Court of the United States, has outlined the scope of due process protections in the juvenile transfer process, finding that a transfer should not occur "'"without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons.'" *State v. D.W.*, 133 Ohio St.3d 434, 2012-Ohio-4544, 978 N.E.2d 894, ¶ 20, quoting *Kent*, 383 U.S. at 554, 86 S.Ct. 1045, 16 L.Ed.2d 84. A "bindover hearing is a 'critically important proceeding' and [] the hearing 'must measure up to the essentials of due process and fair

28

treatment.'" *D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, at ¶ 11, quoting *Kent* at 562; *see also D.W.* at ¶ 20 ("The safeguard of a hearing is contained in the Revised Code and Rules of Juvenile Procedure, and it is grounded in due process and other constitutional protections."); *Aalim* at ¶ 25. However, despite the transfer hearing being a "critically important" hearing that "directs the proceedings down one of two paths with drastically different potential outcomes, [a child's] liberty is not yet at stake * * *, [and] further proceedings before a factfinder are required to determine whether [the child] committed the charged offenses beyond a reasonable doubt." *State v. Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, ¶ 24.

### B. Probable cause arguments

### 1. Cunningham forfeited his arguments regarding the constitutionality of the probable cause standard in R.C. 2152.12(B).

{¶ 63} We first address Cunningham's sixth assignment of error. In it, he argues that the standard for probable cause in R.C. 2152.12(B) violates his right to procedural due process. He contends that due process and fair treatment require more than "minimal certainty" before "subjecting a child to the rigors of adult prosecution and punishment."

{¶ 64} The state responds that Cunningham forfeited this issue by failing to raise it in the juvenile court, and that any error does not rise to the level of plain error. Further, the state argues that Cunningham failed to show that he had a fundamental liberty interest at stake at the time of the transfer hearing, the standard for probable cause requires the state to show more than minimal certainty before a child can be bound over to the adult

29

court, and Cunningham does not attempt to propose a different standard or definition of probable cause.

{¶ 65} Initially, we agree with the state that Cunningham forfeited this issue by failing to raise it in the either the juvenile court or the trial court.

{¶ 66} An appellant who fails to challenge the constitutionality of a statute in the trial court forfeits all but plain-error review on appeal. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 2. Plain error is error that affects substantial rights. Crim.R. 52(B). Three things are required to make an error a "plain error": (1) there must be an error, i.e., a deviation from a legal rule; (2) the error must be plain, i.e., the error "must be an 'obvious' defect in the trial proceedings"; and (3) the error must have affected a defendant's substantial rights, i.e., "the trial court's error must have affected the outcome of * * *" the proceedings. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Plain error should be found "only in exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Hill*, 92 Ohio St.3d 191, 203, 749 N.E.2d 274 (2001), citing *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶ 67} The appellant has the burden of demonstrating that plain error occurred. *Quarterman* at ¶ 2. In the context of a juvenile transfer hearing, to show the prejudice necessary to establish plain error, the appellant must "prove that the error affected the outcome of the proceeding, that is, that he would not have been bound over to the adult

30

court" but for the alleged error.  *State v. Morgan*, 153 Ohio St.3d 196, 2017-Ohio-7565, 103 N.E.3d 784, ¶ 52.

{¶ 68} Here, Cunningham argues that the juvenile court erred by using the probable cause standard for bindover hearings established more than two decades ago in *Iacona*, 93 Ohio St.3d 83, 752 N.E.2d 937.  But he does not even attempt to argue that the court committed plain error by using this standard.  In short, although Cunningham contends that there was an error—i.e., violation of his procedural due process rights—he does not explain how this error was obvious or argue that he would not have been bound over to the trial court but for the juvenile court's use of the probable cause standard in *Iacona*.[2]  "We are not obligated to search the record or formulate legal arguments on behalf of the parties, because appellate courts do not sit as self-directed boards of legal inquiry and research, but [preside] essentially as arbiters of legal questions presented and argued by the parties before them."  (Brackets sic and internal quotations omitted.) *Quarterman* at ¶ 19, citing *State v. Bodyke,* 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part); and *Carducci v. Regan,* 714 F.2d 171, 177 (D.C.Cir.1983).

{¶ 69} Because Cunningham did not argue plain error regarding the probable cause standard, we decline to find it.  Cunningham's sixth assignment of error is not well-taken.

**2. The state presented sufficient evidence to support**

---

[2] Cunningham also fails to propose an alternative standard for probable cause in discretionary transfer hearings that would satisfy procedural due process.

**the juvenile court's finding of probable cause.**

**{¶ 70}** In his fifth assignment of error, Cunningham argues that the state presented only "minimal" evidence at the probable cause hearing that raised "many questions" about Cunningham's "actual involvement" in the shooting. He claims that these questions led to the juvenile court finding probable cause without the state presenting the required credible evidence.

**{¶ 71}** The state responds that the evidence it presented at the probable cause hearing was legally sufficient to support the juvenile court's probable cause finding, and that it was not required to disprove alternate theories of the case before the juvenile court could find probable cause.

**{¶ 72}** A juvenile court's probable cause determination presents a mixed question of law and fact. *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 51. In reviewing that decision, we defer to the juvenile court's findings of fact, as long as they are supported by some competent, credible evidence. *State v. Taylor*, 6th Dist. Lucas No. L-15-1309, 2017-Ohio-139, ¶ 15, citing *A.J.S.* at ¶ 50. But we review de novo the court's legal conclusion of whether the state presented sufficient evidence to demonstrate probable cause to believe that the juvenile committed the acts charged. *Id.*

**{¶ 73}** After hearing the evidence, the juvenile court said that the following facts supported its probable cause determination: (1) Cunningham was "shooting in the direction of where the victim was"; (2) "[e]verybody stipulated that there was a murder, that [C.C.] was shot to death"; and (3) there were no shell casings found at the scene,

32

either inside the bar near C.C.'s body—like there would have been if someone inside the bar killed him—or on the patio near where Cunningham shot his gun, "[b]ut we saw Tacarie bend down to pick something up." The juvenile court's finding that "[e]verybody stipulated that there was a murder, that [C.C.] was shot to death" is incorrect. The parties stipulated that "the victim in this case is deceased[,]" but did not agree to anything more than that. The remainder of the court's factual findings are supported by some competent, credible evidence, so we will use those facts to determine if the evidence is legally sufficient to support a finding of probable cause.

{¶ 74} In this case, Cunningham was charged with felony murder, felonious assault, and tampering with evidence.

{¶ 75} To establish probable cause for felony murder, the state had to provide credible evidence that Cunningham caused the death of C.C. as a proximate result of committing or attempting to commit an offense of violence that is a first- or second-degree felony. R.C. 2903.02(B). Felonious assault in violation of R.C. 2903.11(A)(2) is a second-degree felony offense of violence. R.C. 2903.11(D)(1)(a); R.C. 2901.01(A)(9)(a).

{¶ 76} To establish probable cause for felonious assault, the state had to provide credible evidence that Cunningham caused or attempted to cause physical harm to another by means of a deadly weapon. R.C. 2903.11(A)(2). "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). A gun is a deadly weapon. *In re Marcus T.D.*, 6th Dist. Lucas No.

33

L-02-1376, 2004-Ohio-477, ¶ 9; R.C. 2923.11(A), (B); *see also State v. Vondenberg*, 61 Ohio St.2d 285, 289, 401 N.E.2d 437 (1980) (trier of fact can draw reasonable inferences about the deadly nature of a weapon used in the commission of a crime).

{¶ 77} And to establish probable cause for tampering with evidence, the state had to provide credible evidence that Cunningham knew that an investigation was in progress or was likely to be instituted and concealed or removed potential evidence with the purpose to impair the potential evidence's value or availability in the investigation. R.C. 2921.12(A)(1); *State v. Straley*, 139 Ohio St.3d 339, 2014-Ohio-2139, 11 N.E.3d 1175, ¶ 11. A person acts "knowingly," regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). A person has knowledge of circumstances when he is aware that such circumstances probably exist. *Id.* An offender's knowledge of a likely investigation can be inferred when the crime is a type—such as a shooting death in a public place—that is likely to be reported, and the likelihood of an investigation is measured at the time of the alleged tampering. *State v. Martin*, 151 Ohio St.3d 470, 2017-Ohio-7556, 90 N.E.3d 857, ¶ 110, 116, 118 ("As a matter of common sense, we can infer that a person who had shot two people and left them for dead in a residential neighborhood would know that an investigation was likely. * * * Homicides are highly likely to be discovered and investigated."). A person acts "purposely" when it is his intention to cause a certain result. R.C. 2901.22(A).

34

{¶ 78} The evidence at the probable cause hearing showed that a person—positively identified as Cunningham—pointed and fired a gun at an area where C.C. had been standing shortly before the shooting. After Cunningham fired the gun, C.C. was found inside the building, which was in the direction that Cunningham aimed, with a gunshot wound. The parties stipulated that C.C. was dead, and Mussery, after investigating the crime, believed that he had died by "gunfire." Taken together, this shows that Cunningham shot a gun—a deadly weapon—which fired a bullet that presumably hit C.C., causing physical harm to C.C. and ultimately leading to his death. This evidence—although far from complete or perfect—is sufficient to "raise[] more than a mere suspicion of [Cunningham's] guilt * * *" of felonious assault and felony murder, which is all that is required at the probable cause hearing. *Iacona*, 93 Ohio St.3d at 93, 752 N.E.2d 937.

{¶ 79} Additionally, the state presented evidence that Cunningham returned to the patio and picked up something approximately one minute after shooting the gun. Mussery's law enforcement experience led him to believe that Cunningham picked up shell casings because of where Cunningham was standing when he shot the gun, where he bent down to pick up the item, and the fact that no shell casings were recovered from the patio or inside the bar. The juvenile court found Mussery's testimony credible on this point, and we defer to the juvenile court's findings of fact. We can infer that Cunningham knew that the police were likely to investigate a shooting at a bar, particularly when the shooting resulted in someone's death. *See Martin* at ¶ 110, 116,

118. We can also infer that Cunningham's purpose in removing shell casings from the patio—where a shooting just happened—was to impair their value or availability in the forthcoming investigation. *State v. Smith*, 6th Dist. Lucas No. L-14-1224, 2016-Ohio-150, ¶ 24 (it is reasonable to infer that a person who picks up shell casings after a shooting and removes them from the place where the shooting happened does so to impair their availability as evidence in an investigation); *State v. Hallman*, 8th Dist. Cuyahoga No. 103675, 2016-Ohio-3465, ¶ 15. Taken together, this is sufficient to "raise[] more than a mere suspicion of [Cunningham's] guilt * * *" of tampering with evidence. *Iacona* at 93.

{¶ 80} Cunningham complains that the state's evidence creates more questions about the circumstances of the crimes than it does answers, and that there were potentially other explanations for how C.C. ended up dead, which, he claims, shows a lack of credible evidence supporting the juvenile court's probable cause determination. However, as the juvenile court pointed out, it was not required to find that the state proved the crimes beyond a reasonable doubt. Relatedly, the state's evidence was only required to be *credible*; it did not have to be *unassailable*, as Cunningham seems to argue. *A.J.S.*, 120 Ohio St.3d 185, 2008-Ohio-5307, 897 N.E.2d 629, at ¶ 46; *D.M.S.*, 2021-Ohio-1214, 170 N.E.3d 61, at ¶ 19. Moreover, the state is not required to disprove alternate theories of the crime at the probable cause hearing, and the juvenile court oversteps its limited, gatekeeping role if it weighs the merits of competing prosecution

and defense theories of the case, which are matters for the ultimate trier of fact. *A.J.S.* at ¶ 43, 61.

{¶ 81} In sum, the juvenile court's findings of fact (with the exception of its misstatement about the parties' stipulation regarding the fact of C.C.'s death) were supported by some competent, credible evidence. And the state presented credible evidence of each element of the crimes charged sufficient to raise more than a mere suspicion of Cunningham's guilt of felony murder, felonious assault, and tampering with evidence. Accordingly, the juvenile court did not err by finding probable cause to believe that Cunningham committed the crimes.

{¶ 82} Cunningham's fifth assignment of error is not well-taken.

### C. Amenability issues

### 1. Cunningham's constitutional rights were not violated during the amenability phase.

{¶ 83} In his first assignment of error, Cunningham argues that the juvenile court violated his rights to due process, fundamental fairness, and the presumption of innocence by presuming that he was guilty before determining whether he was amenable to care or rehabilitation in the juvenile system. The court's improper focus on his guilt, combined with Sherman's improper focus on his lack of remorse, he claims, led to the court finding him not amenable and improperly transferring him to adult court.

{¶ 84} The state responds that the factors listed in R.C. 2152.12(D) and (E) that the juvenile court must weigh in making its amenability determination are written in a

37

way that requires the court to assume that the juvenile committed the acts charged.  It argues that the court did not violate any of Cunningham's rights by following the requirements of the statute and that a child's level of remorse is routinely considered in amenability hearings.

{¶ 85} We agree with Cunningham that the juvenile court misspoke when it stated that it was required to "assume guilt" during the amenability phase.  But, upon review of the entire proceedings, we do not find any evidence to suggest that this single misstatement affected the fundamental fairness of the amenability hearing.

{¶ 86} As a preliminary matter, we cannot deny that the outcome of a transfer hearing has significant consequences for a juvenile.  *See State v. Smith*, 167 Ohio St.3d 423, 2022-Ohio-274, -- N.E.3d --, ¶ 21, quoting *Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, at ¶ 73 (O'Connor, C.J., dissenting) ("The transfer hearing * * * serves as a vehicle by which a child offender is deprived of the rehabilitation and treatment potential of the juvenile-justice system.").  However, an amenability hearing, at its core, is nothing more than a hearing to determine the forum that will ultimately hear the child's case and determine his guilt or innocence.  *State v. LaRosa*, 11th Dist. Trumbull No. 2018-T-0097, 2020-Ohio-160, ¶ 36 ("[T]he purpose of the amenability determination is establishing which forum will ultimately hear the case—the juvenile division or the general division.); *State v. McKinney*, 2015-Ohio-4398, 46 N.E.3d 179, ¶ 13 (1st Dist.) ("The bindover proceeding simply changed the forum in which [appellant's] guilt or innocence was to be determined.").  As a consequence, neither a

juvenile's liberty interests nor his presumption of innocence are implicated at the amenability hearing. *Garner*, 6th Dist. Lucas No. L-18-1269, 2020-Ohio-4939, at ¶ 24 (Although a transfer hearing is a "critically important" hearing that "directs the proceedings down one of two paths with drastically different potential outcomes, [a child's] liberty is not yet at stake * * *, [and] further proceedings before a factfinder are required to determine whether [the child] committed the charged offenses beyond a reasonable doubt."); *LaRosa* at ¶ 36 ("a presumption of innocence is not relevant during an amenability determination * * *"); *McKinney* at ¶ 13 ("We question whether the transfer of jurisdiction implicates the Due Process Clause at all. The transfer didn't deprive [appellant] of his liberty. That happened later, when the general division of the common pleas court found him guilty and imposed sentence."). Because the presumption of innocence is not implicated during an amenability hearing, we find that the juvenile court did not violate Cunningham's constitutional rights in making its amenability determination.

{¶ 87} Moreover, although the factors in R.C. 2152.12(D) and (E) are written so that a juvenile court can, as much as practicable, consider an accused juvenile-offender's amenability without encroaching upon the child's presumption of innocence by repeatedly referring to "the alleged act," "the act charged," and the child "allegedly committing" the act, it would be impossible for the court to consider the child's amenability to treatment and rehabilitation in the juvenile system *without* considering the child's role in the act and, at least to some extent, his level of culpability. *See, e.g.,* R.C.

39

2152.12(D)(1) ("The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act."), (E)(2) ("The child acted under provocation in allegedly committing the act charged."); *see also State v. Watson*, 47 Ohio St.3d 93, 96, 547 N.E.2d 1181 (1989) ("Generally the greater the culpability of the offense, the less amenable will the juvenile be to rehabilitation."). Thus, while the statute does not direct the juvenile court to "assume" that an accused juvenile-offender is "guilty" at the amenability stage, it is unrealistic to expect that issues of culpability will be entirely absent from an amenability hearing.

{¶ 88} Further, we find Cunningham's claims that the juvenile court was "confus[ed]" by Sherman's opinions that Cunningham was not amenable to staying in the juvenile system because of his guilt and lack of remorse are unavailing.

{¶ 89} Under R.C. 2152.12(D) and (E), the juvenile court is *required* to consider "*any other relevant factors * * *"* in determining whether the factors in favor of retaining jurisdiction over a child outweigh the factors in favor of relinquishing jurisdiction. (Emphasis added.) "Although the seriousness of the crime is not a factor specified under R.C. 2152.12(D), the juvenile court is permitted to consider it in making a discretionary bindover decision." *State v. Erwin*, 10th Dist. Franklin No. 09AP-918, 2012-Ohio-776, ¶ 11, citing *Watson* at syllabus. Similarly, although it is not listed in the statute, "the remorse of a juvenile offender is regularly discussed and presented to the court in aid of determining whether the offender is amenable to rehabilitation within the juvenile system." *LaRosa* at ¶ 37 (collecting cases).

40

{¶ 90} First, we find that Cunningham misconstrues Sherman's opinion regarding Cunningham's "guilt." Sherman did not say that Cunningham was not amenable to staying in the juvenile system because he was guilty. He opined that, if Cunningham actually committed the murder, he was not amenable to staying in the juvenile system because of the way in which the murder was committed. The distinction is important. The information that Sherman had available to him during his evaluation led him to conclude that "[t]he nature of this offense, however, (*if indeed he committed it*) is a cause of serious concern in terms of future amenability." (Emphasis added.) That is, Sherman was concerned about the nature and circumstances of the offenses that Cunningham was charged with and what those meant for Cunningham's amenability (i.e., if Cunningham was the lone actor and sole shooter who murdered someone without expressing remorse, and denied his involvement despite apparent evidence to the contrary, Sherman was concerned that Cunningham was not amenable to treatment in the juvenile system). Sherman did not say that Cunningham was not amenable because he committed *a* crime; he said that Cunningham was not amenable *if* he committed this *specific* crime because of the specific details of the crime. This took into account the nature of the acts that Cunningham was charged with, which was an appropriate consideration. *Erwin* at ¶ 11. The juvenile court did not err by relying on Sherman's opinion regarding the nature of the crimes as they related to Cunningham's amenability.

{¶ 91} Second, Sherman testified that Cunningham's apparent lack of remorse was a sign of "an incipient antisocial character which would make it almost beyond the realm

of treatment, certainly beyond the realm of treatment with the current situation of DYS[,]" which is certainly relevant to the juvenile court's amenability determination. He also testified that what came across as a lack of remorse could have been the product of Cunningham's professed innocence and general guardedness from being in an unfamiliar situation with an unfamiliar person. This information was all relevant to the juvenile court's amenability determination, and the trial court did not err by relying on it.

{¶ 92} In sum, nothing about the amenability hearing was fundamentally unfair. Cunningham's presumption of innocence was not implicated at the amenability stage, and the factors that the juvenile court considered were proper. Therefore, we find that Cunningham's first assignment of error is not well-taken.

### 2. Cunningham forfeited his arguments about the constitutionality of R.C. 2152.12(B).

{¶ 93} In his third assignment of error, Cunningham argues that R.C. 2152.12(B) is unconstitutional because it does not specify the level of proof needed to show that a child is not amenable to care or rehabilitation in the juvenile system or allocate the burden of proof. He contends that the state, as the proponent of the transfer, should be allocated the burden of proof, and that it should have to prove that the child is not amenable by clear and convincing evidence.[3]

---

[3] The Supreme Court of Ohio accepted issues similar to those that Cunningham argues in his third and fourth assignments of error in *State v. Nicholas*, Supreme Court case No. 2020-1429. The case has been argued and is pending a decision on three propositions of law:

{¶ 94} The state responds that Cunningham forfeited this issue by failing to raise it in the juvenile court. Assuming that he did not forfeit the issue, the state contends that R.C. 2152.12(B)(3) is constitutional on its face because, as Cunningham points out in his brief, the use of "outweigh" in the statute suggests a preponderance-of-the-evidence standard, so the statute is not silent on the issue of the burden of proof. The state also contends that the statutory scheme intentionally does not have a burden of persuasion; instead, each side is permitted to "present relevant and competent evidence to assist the court in its determination of which statutory factors are applicable and whether the juvenile is amenable to treatment in the juvenile system."

{¶ 95} Like with the constitutionality of the probable cause standard, Cunningham did not raise this issue in the juvenile court or the trial court, so he has forfeited all but plain-error review. *Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, at ¶ 2. And, like with his sixth assignment of error, Cunningham does not attempt to make a plain-error argument regarding the constitutionality of R.C. 2152.12(B), and we are not

---

First Proposition of Law: Because standards of review are functions of due process, non-amenability decisions must be supported by clear and convincing evidence[.]

Second Proposition of Law: As the party moving for discretionary transfer under R.C. 2152.12(B), prosecutors bear the burden of proving the child is not amenable to juvenile court treatment. A transfer decision without any affirmative proof of non-amenability must be reversed[.]

Third Proposition of Law: To meaningfully decide whether juvenile offenders are not amenable to juvenile court treatment, juvenile judges must first weigh all the available dispositional options, especially, where provided by statute, a serious youthful offender disposition[.]

required to make one for him. *Id.* at ¶ 19. Accordingly, Cunningham's third assignment of error is not well-taken.

### 3. The juvenile court did not abuse its discretion by finding Cunningham amenable to transfer.

{¶ 96} In his second assignment of error, Cunningham argues that the juvenile court erred by finding that he was not amenable to care or rehabilitation within the juvenile system because it did not fully consider the reasons that Cunningham was amenable to staying in the juvenile system, such as his signs of immaturity, or clearly articulate its reasons for deciding to transfer the case. He contends that the court should have specifically explained why Cunningham could not be rehabilitated in the time before he turned 21 and what rehabilitation goals could and could not be accomplished before Cunningham aged out of the juvenile system. He also argues that the juvenile court's amenability decision was not supported by clear and convincing evidence.

{¶ 97} The state responds that the juvenile court considered the statutory factors and there is a rational basis in the record to support its amenability finding, so the court did not abuse its discretion by finding that Cunningham was not amenable to remaining in the juvenile system.

{¶ 98} Cunningham's argument against the juvenile court's amenability determination is threefold: (1) the court improperly weighed the factors, (2) the court provided insufficient justification for its findings, and (3) the court improperly relied on Sherman's "flawed" report. We address each argument in turn.

44

## a. Weight of the factors

{¶ 99} First, Cunningham argues that the juvenile court "did not consider all the reasons Tacarie was amenable to treatment in the juvenile system." Specifically, Cunningham complains that the court did not consider that (1) he "had limited juvenile court involvement and had never participated in any programming through the juvenile court or been incarcerated"; (2) the court's concerns for public safety could be addressed by the "myriad of options that combine treatment and locked placement * * *" in the juvenile system; and (3) he was not mature enough for transfer because he "showed signs of immaturity when meeting with Dr. Sherman and by putting himself in a bad situation the night of the offense by being at an after-hours night club where multiple people had weapons."

{¶ 100} The juvenile court's wide latitude to determine whether to retain or relinquish jurisdiction over a child's case means that the court also has the discretion to decide how much weight to give to each factor in R.C. 2152.12(D) and (E). *In re M.A.*, 12th Dist. Brown No. CA2018-07-005, 2019-Ohio-829, ¶ 33, citing *State v. Everhardt*, 3d Dist. Hancock No. 5-17-25, 2018-Ohio-1252, ¶ 22; and *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 15. As long as the juvenile court considered the factors in the statute and the record contains some rational basis to support the court's findings, we will not find that the court abused its discretion. *D.M.*, 6th Dist. Lucas Nos. L-16-1237, L-16-1238, and L-16-1270, 2017-Ohio-8768, at ¶ 47. An appellant's disagreement with the way the juvenile court weighed the factors is not a reason to

reverse the court's decision. *See State v. Ramsden*, 12th Dist. Clinton No. CA2020-11-016, 2021-Ohio-3071, ¶ 23, *appeal accepted* 165 Ohio St.3d 1503, 2022-Ohio-85, 179 N.E.3d 118 ("[G]iven that it is the juvenile court, and not [the appellate] court, that has the discretion to determine how much weight should be afforded to the factors set forth in R.C. 2152.12(D) and (E), [appellant's] challenge to the weight that the juvenile court ultimately decided to attribute to each [of] those factors lacks merit.").

{¶ 101} Here, the juvenile court acknowledged that Cunningham did not have a history of involvement with the juvenile court and that he would have approximately five years to receive treatment if the juvenile court retained jurisdiction. Although the court did not get into the specifics of why it found that Cunningham was mature enough for transfer, the record contains Sherman's testimony and report, which explain that he looks for "gross immaturity" that would weigh against transfer, rather than the general "characteristics of youth" that Cunningham points to in his brief (things that Sherman called "boyishness rather than maturity * * *" in his testimony). Sherman concluded that Cunningham was not living a 15-year-old's lifestyle and behaved more like an adult than a child; two examples that Sherman pointed to were Cunningham traveling to Toledo from Dayton by himself without his mother's knowledge and spending time at an after-hours bar. There is a rational basis in the record to support the court's findings on these issues. Although Cunningham might have wanted the court to give these factors more weight or make a determination more in his favor, we cannot find that the juvenile court

46

abused its discretion regarding the issues of his lack of juvenile court involvement and his maturity for transfer.

### b. Specificity of findings

{¶ 102} Next, Cunningham argues that the juvenile court did not make certain, highly-specific findings to justify its decision that he was not amenable to staying in the juvenile system. He relies on *State v. D.H.*, 2d Dist. Montgomery No. 26383, 2015-Ohio-3259, in which a divided panel of the Second District reversed the juvenile court's amenability determination because

> [t]he juvenile court's entry under review contains insufficient factual findings to identify how the court reached its conclusion that D.H. could not be rehabilitated in the juvenile system. The entry does not identify which of the reports and records reviewed by the psychologist were also reviewed and considered by the court. The transcript reveals that no exhibits or documentary evidence were admitted in evidence at the amenability hearing * * *. The court does not identify or discuss what programs are, or are not, available in the juvenile system to satisfy the child's health needs * * *. Additionally, the court does not make any specific findings about the child's educational deficiencies, and does not identify what programs are, or are not, available in the juvenile system to meet D.H.'s educational needs. The * * * juvenile court's findings contain no discussion of what rehabilitation goals can, or cannot, be accomplished

47

in the juvenile system * * *, or what programs are, or are not, available in the juvenile system to accomplish these goals. We note that if the juvenile court had denied the motion to transfer D.H., upon a finding of delinquency, the court could have imposed a number of different juvenile dispositions * * *. The juvenile court's entry relinquishing jurisdiction did not discuss why none of these options would suffice to rehabilitate D.H. in the juvenile system, especially in light of the fact that he had no prior delinquency adjudications * * *.

*Id.* at ¶ 17.

{¶ 103} However, we—and numerous other districts—have observed that "'other courts have never gone so far as the Second District in directing the juvenile court's analysis'" in an amenability determination. *D.M.* at ¶ 47, quoting *Blair*, 5th Dist. Stark No. 2016CA00180, 2017-Ohio-5865, at ¶ 39; and citing *State v. Reeder*, 2016-Ohio-212, 57 N.E.3d 458, ¶ 18 (10th Dist.); *Marshall* at ¶ 15; and *State v. Rice*, 12th Dist. Butler No. CA2016-01-005, 2016-Ohio-5372, ¶ 18, fn. 2. In *D.M.*, we rejected the nitpicky approach required by the Second District and "reiterate[d] that [a]s long as the court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, we cannot conclude that the [juvenile] court abused its discretion in deciding whether to transfer jurisdiction." (First brackets added and internal quotation omitted.) *Id.* We did not require the juvenile court to "'individually analyze each and every possible avenue for juvenile rehabilitation and

48

decide that [D.M.] was not amenable to them.'" *Id.* at ¶ 50, quoting *State v. Curtis*, 3d

Dist. Allen No. 1-15-55, 2016-Ohio-6978, ¶ 50. We see no reason to reverse course here.

{¶ 104} The juvenile court's transfer entry in this case is succinct, but it includes

the factors that it found applicable and provides its reasons for relinquishing jurisdiction:

"Although this youth would be in the juvenile system for 5 more years, it is not the

amount of time but rather the nature of this crime that leads this Court to believe he

would not be amenable to treatment within that period of time." More importantly, the

record in this case does not suffer from the deficiencies that the majority in *D.H.* found in

its record. We have sufficient information to conduct a meaningful review of the juvenile

court's decision, including the testimony of Mussery and Sherman, Sherman's report, the

investigation report required by R.C. 2152.12(C), and a selection of Cunningham's

school records.

{¶ 105} Because the record allows us to conduct a meaningful review of the

juvenile court's decision, we find that Cunningham's argument regarding the specificity

of the juvenile court's findings lacks merit.

### c. Sherman's report

{¶ 106} Finally, Cunningham claims that the juvenile court was improperly

influenced by Sherman's "flawed" conclusions that Cunningham could not be

rehabilitated because of the seriousness of the offense and his lack of remorse, while also

49

finding that, up until the shooting, there were no "absolute contraindications" to keeping Cunningham in the juvenile system.[4]

{¶ 107} We have already determined that Cunningham's perceived remorse and the seriousness of the offenses were proper considerations under the "any other relevant factors * * *" provisions in R.C. 2152.12(D) and (E). *Erwin*, 10th Dist. Franklin No. 09AP-918, 2012-Ohio-776, at ¶ 11; *LaRosa*, 11th Dist. Trumbull No. 2018-T-0097, 2020-Ohio-160, at ¶ 37. Thus, the fact the Sherman took these factors into consideration in reaching his conclusions does not make his report "flawed." He was clear that his amenability recommendation hinged on whether Cunningham was actually involved in the crime because of the nature of the murder (i.e., if Cunningham was the shooter, he acted alone, did not appear to feel remorse about his participation, and potentially posted on Facebook about the victim being a "trophy").

{¶ 108} In reaching its amenability determination, the juvenile court interpreted Sherman's recommendation to mean that "if [Cunningham is] guilty of this, then it doesn't matter that there are six years left [for treatment in the juvenile system] * * * because this is such a cold blooded act, assuming that this—that he did this. It is cold blooded with no apparent motive * * *." That fact, combined with the other factors in

---

[4] Cunningham's brief quotes Sherman as saying "that there was 'nothing in Tacarie's past that showed he would not be amenable to treatment.'" This statement does not appear in the juvenile court transcript or Sherman's report. The closest statement in the transcript is Sherman agreeing when Cunningham's attorney said, "Other than the offense for what we're here, there is nothing in Tacarie's history that shows he would not be amenable to the sanctions that could be produced."

50

favor of transfer, led the court to conclude that the factors in favor of transfer outweighed the factors against transfer, that Cunningham was not amenable to care or rehabilitation in the juvenile system, and that the community needed to be protected from him. There is a rational basis in the record to support the juvenile court's decision, so we cannot find that the court abused its discretion.

{¶ 109} Cunningham's second assignment of error is not well-taken.

### D. The juvenile court did not commit plain error by failing to explicitly consider the possibility of Cunningham receiving a SYO disposition.

{¶ 110} In his fourth assignment of error, Cunningham argues that the juvenile court should have considered all possible dispositional options—including the possibility of a SYO disposition—before deciding to transfer his case to the trial court. He contends that the juvenile court's failure to do so was plain error that prevented him from receiving treatment in the juvenile system, and that we should vacate his sentence and remand his case to the juvenile court.

{¶ 111} In response, the state argues that Cunningham failed to show that the juvenile court committed plain error by not considering all possible disposition options before transferring the case, and, in any case, a SYO disposition is not an option unless the state elects to pursue it, which it did not do in this case.

{¶ 112} At its most basic, a serious youthful offender disposition is a more restrictive disposition for juveniles who are not transferred to adult court that includes a stayed adult sentence, which is only imposed if the juvenile fails to successfully complete

51

the juvenile portion of his disposition. *State v. D.H.*, 120 Ohio St.3d 540, 2009-Ohio-9, 901 N.E.2d 209, ¶ 18, citing R.C. 2152.11 and 2152.13. A juvenile court can only impose a SYO disposition if the prosecutor initiates the SYO process by indicting the child as a serious youthful offender, filing a bill of information designating the child as a serious youthful offender, or, until the prosecutor can get an indictment or information, including the SYO designation in the original juvenile complaint or filing a written notice of intent to seek a SYO disposition.[5] R.C. 2152.13(A)(1)-(4).

{¶ 113} Simply put, the procedural posture of Cunningham's case meant that he was not eligible for a SYO disposition. First, his case was transferred out of the juvenile court, which immediately makes the definition of "serious youthful offender" inapplicable to him. R.C. 2152.02(W) ("'Serious youthful offender' means a person who is eligible for a mandatory SYO or discretionary SYO *but who is not transferred to adult court* under a mandatory or discretionary transfer * * *." (Emphasis added.)).

{¶ 114} Second, the juvenile court could not have imposed a SYO disposition even if it had retained jurisdiction because the state did not seek a SYO designation in

---

[5] Except in cases where the juvenile court is required to impose a mandatory SYO disposition on juveniles who are subject to mandatory transfer because they were 16 years or older at the time that they (1) allegedly committed an act that would be aggravated murder, murder, attempted aggravated murder, or attempted murder if committed by an adult or (2) allegedly committed an act that would be voluntary manslaughter, kidnapping, rape, aggravated arson, aggravated robbery, aggravated burglary, or first-degree-felony involuntary manslaughter if committed by an adult and the juvenile had a firearm on or about their person or under their control and displayed, brandished, indicated they possessed, or used the firearm to facilitate the commission of the act. R.C. 2152.13(A); R.C. 2152.121(B), (B)(3); R.C. 2152.12(A)(1)(a)(i), (A)(1)(b)(ii); R.C. 2152.02(BB).

this case. Because Cunningham was only 15 at the time of the shooting, he did not fall into the group of alleged delinquents who automatically receive a SYO designation. When the juvenile is under 16, nothing in the SYO statutes permits the juvenile court to designate the child as a serious youthful offender or impose a blended SYO dispositional sentence without some affirmative action from the state seeking the SYO designation and disposition. *See* R.C. 2152.13(A)(1)-(4); 2152.121(B)(3). As we discussed above, a juvenile court is not required to "individually analyze each and every possible avenue for juvenile rehabilitation and decide that [the juvenile] was not amenable to them" before deciding to transfer the case to adult court. (Internal quotation omitted.) *D.M.*, 6th Dist. Lucas Nos. L-16-1237, L-16-1238, and L-16-1270, 2017-Ohio-8768, at ¶ 50. We think this is particularly true when asking the court to conduct an analysis would be a completely academic exercise in the absence of the state's request for a SYO designation.

**{¶ 115}** Both the Second District and the Tenth District have recently addressed this same issue and reached the same conclusion. *See State v. Nicholas*, 2020-Ohio-3478, 155 N.E.3d 304, ¶ 74-78 (2d Dist.), *appeal allowed* 161 Ohio St.3d 1439, 2021-Ohio-375, 162 N.E.3d 822; and *State v. L.A.B.*, 10th Dist. Franklin No. 20AP-120, 2021-Ohio-4323, ¶ 68-75, *appeal allowed* 166 Ohio St.3d 1483, 2022-Ohio-1284, 186 N.E.3d 815. As the Tenth District summarized its conclusion in *L.A.B.*, at ¶ 75, because

> the juvenile court determined appellant was not amenable to care or
>
> rehabilitation within the juvenile system and granted the request for transfer
>
> to adult court, and where the state did not initiate the process for a SYO

53

disposition, appellant has failed to show the juvenile court erred in failing to consider a blended sentence as part of its amenability determination.

We agree. Cunningham's fourth assignment of error is not well-taken.

### E. Cunningham did not receive ineffective assistance of counsel.

{¶ 116} In his final assignment of error, Cunningham argues that his trial counsel provided ineffective assistance by failing to advocate for a clear and convincing evidence standard of proof for the amenability hearing and failing to seek a SYO disposition. He claims that the outcome of his case would have been different if trial counsel had asked for these things, and that he was prejudiced by counsel's failure.

{¶ 117} The state responds that counsel cannot be found ineffective for failing to ask the juvenile court to "apply a standard of proof that is not supported by the law," or seek an unavailable sentence, and that Cunningham was not prejudiced by either of these things.

{¶ 118} To prevail on a claim of ineffective assistance of counsel, the appellant must show that counsel's conduct so undermined the proper functioning of the adversarial process that the trial court cannot be relied on as having produced a just result. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Properly licensed Ohio lawyers are presumed to be competent, *State v. Gondor,* 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 62, and there are "countless" ways for an attorney to provide effective assistance in a case, so "'[j]udicial scrutiny of

counsel's performance must be highly deferential.'"  *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), quoting *Strickland* at 689.

{¶ 119} To establish ineffective assistance of counsel, the appellant must show "(1) deficient performance of counsel, i.e., performance falling below an objective standard of reasonable representation, and (2) prejudice, i.e., a reasonable probability that, but for counsel's errors, the proceeding's result would have been different."  *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 204.  "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *State v. Sanders*, 94 Ohio St.3d 150, 151, 761 N.E.2d 18 (2002), quoting *Strickland* at 694.

{¶ 120} Counsel is "strongly presumed" to have rendered adequate assistance and "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985), quoting *Strickland* at 694-695.  Generally, trial strategy and tactical decisions—even debatable ones—cannot form the basis of a claim of ineffective assistance of counsel.  *State v. Grissom*, 6th Dist. Erie No. E-08-008, 2009-Ohio-2603, ¶ 22

{¶ 121} Cunningham first argues that his trial counsel was ineffective for failing to ask for a SYO disposition.  However, as discussed under the fourth assignment of error, Cunningham was not eligible for a SYO disposition because his case was in the adult court and the state did not seek the SYO designation, so we cannot say that counsel acted unreasonably in failing to ask the court to impose a SYO sentence.  Counsel is not

required to raise meritless issues. *State v. Jones*, 91 Ohio St.3d 335, 354, 744 N.E.2d 1163 (2001), citing *State v. Taylor*, 78 Ohio St.3d 15, 31, 676 N.E.2d 82 (1997). Even if trial counsel had asked for a SYO blended sentence, it is highly unlikely that the juvenile court would have granted the request (because it is unsupported by the SYO statutes), so there is no reasonable probability that the request would have changed the outcome of the case.

{¶ 122} We also find that trial counsel's performance did not fall below an objective standard of reasonable representation regarding the standard of proof for the amenability hearing. Although Cunningham claims that "the burden of proof at an amenability hearing is not settled[,]" and his attorney should have taken the opportunity to advocate for a different standard of proof, the case law does not show conflicts among the districts or any confusion about how juvenile courts are to make their amenability determinations. And Cunningham cannot show that he was prejudiced by counsel's failure to ask for a new standard of proof because the juvenile court used the standard that Cunningham wanted his counsel to advocate for. In its transfer entry, the juvenile court said that it was "clearly convinced" that the factors in favor of transfer outweighed the factors against transfer, which indicates that the court found Cunningham not amenable by clear and convincing evidence.

{¶ 123} Because Cunningham cannot demonstrate that his counsel's performance fell below an objective standard of reasonable representation, or that he was prejudiced

by counsel's alleged failings, Cunningham cannot prove that he received ineffective assistance of counsel. Accordingly, his seventh assignment of error is not well-taken.

### III.    Conclusion

{¶ 124} For the foregoing reasons, the June 11, 2021 judgment of the Lucas County Court of Common Pleas is affirmed. Cunningham is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____
JUDGE

Christine E. Mayle, J. _____
CONCUR.

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.