[Cite as *State v. Price*, 2025-Ohio-685.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                    Court of Appeals No.  L-24-1014

    Appellee                              Trial Court No.  CR0202301403

v.

Tayvion Price                                  **DECISION AND JUDGMENT**

    Appellant                             Decided:  February 28, 2025

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Brenda J. Majdalani, Assistant Prosecuting Attorney, for appellee.

Timothy B. Hackett, for appellant.

* * * * *

**OSOWIK, J.**

**{¶ 1}** This is an appeal from the judgment of the Lucas County Court of Common Pleas, General Division, which sentenced juvenile appellant, Tay'Vion[1] Price, to life imprisonment with parole eligibility after 15 years, after accepting his plea to murder and convicting him for same. For the reasons set forth below, this court affirms the judgment of the trial court.

---

[1] Appellant's name is alternatively stated in the record as Tay'vion and as Tayvion.

**{¶ 2}** Appellant sets forth three assignments of error:

1. The juvenile court abused its discretion and violated Tayvion Price's statutory and due process rights when it transferred his case for criminal prosecution, without first considering all the available evidence and a critical statutory factor, and without sufficient credible evidence of non-amenability, in violation of R.C. 2152.12(B); the Fifth and Fourteenth Amendments to the U.S. Constitution; and Article I, Section 16 of the Ohio Constitution. (2.7.23 Judgment Entry).

2. As applied to juvenile offenders like Tayvion, R.C. 2929.02(B)'s automatic, mandatory 15-to-life sentence plainly violates a juvenile's fundamental rights as secured by Article I, Section 9 and 16 of the Ohio Constitution, and by the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution. Crim.R. 52.

3. As applied to juvenile offenders as a class, including Trayvion, R.C. 2929.02(B)'s automatic 15-to-life sentence plainly violates a juvenile's statutory rights under later-enacted R.C. 2929.19(B)(1)(b). Because the two statutes are in direct conflict R.C. 2929.19(B)(1)(b) must prevail. Crim.R. 52; R.C. 1.47; 1.52.

## I. Background

**{¶ 3}** This case originated in the Juvenile Division (hereafter, "juvenile court") with a complaint in delinquency filed by appellee, state of Ohio, on June 15, 2022, against the 15-year-old appellant for violating: (1) R.C. 2903.02(B), murder and an unclassified felony under R.C. 2929.02, and (2) R.C. 2903.11(A), felonious assault with a firearm specification and a second-degree felony under R.C. 2903.11(D)(1)(a). Appellee then filed on June 29, 2022, a complaint in delinquency for three additional offenses, each with a firearm specification: (3) violating R.C. 2903.01(B), aggravated murder and an unclassified felony under R.C. 2923.02; (4) violating R.C. 2903.02(B), murder and an unclassified felony under R.C. 2923.02; and (5) violating R.C. 2911.01(A)(1), aggravated robbery and a first-degree felony under R.C. 2911.01(C). Appellee concurrently

2.

dismissed the original R.C. 2903.02(B) murder charge without the firearm specification. Appellee alleged that on June 14, 2022, at around 7:00 pm, appellant and another juvenile planned a weapons transaction with a third person in Toledo, Lucas County, Ohio. During the transaction, appellant and the other youth robbed the third person and then appellant shot and killed the victim. Two months prior to appellant committing these offenses, he had been adjudicated a delinquent youth and convicted of an F4 CCW. Appellant denied all charges, and discovery exchanges commenced.

{¶ 4} On August 10, 2022, appellee filed R.C. 2152.12(B) motions for discretionary transfer from the juvenile court to the common pleas court's general division of the aggravated murder, murder, aggravated robbery and felonious assault charges. The transfer process is also called a "bindover" from the juvenile court to the "adult court." R.C. 2152.12(B) states:

> (B) Except as provided in [R.C. 2152.12(A)], after a complaint has been filed alleging that a child is a delinquent child by reason of committing one or more acts that would be an offense if committed by an adult and if any of those acts would be a felony if committed by an adult, the juvenile court at a hearing may transfer the case if the court finds all of the following with respect to an act charged that would be a felony:
> (1) The child was fourteen years of age or older at the time of the act charged.
> (2) There is probable cause to believe that the child committed the act charged.
> (3) The child is not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions. In making its decision under this division, the court shall consider whether the applicable factors under [R.C. 2152.12(D)] indicating that the case should be transferred outweigh the applicable factors under [R.C. 2152.12(E)] indicating that the case should not be transferred. The record shall indicate the specific factors that were applicable and that the court weighed.

3.

{¶ 5} The probable cause hearing was held on October 4, and appellant does not dispute the juvenile court's finding of probable cause that appellant probably committed the charged offenses. Two Toledo police officers testified being the first-responders to find the victim in the alley off the 4000-block of Burnham Avenue bleeding from gunshot wounds. The victim worked in the nearby carryout, where the underlying weapons transaction began. The police officers initiated life-saving protocols on the victim until paramedics arrived, but the victim died at the scene. On and near the victim were three guns and crumpled cash. Neither police officer saw appellant at the scene, and there was no surveillance video of the alley showing the murder.

{¶ 6} The investigating detective, with 31 years of law enforcement experience, testified that in addition to gathering witness statements, he obtained surveillance videos from nearby businesses and residences. The surveillance videos documented the events in the area at the time before, during, and after the murder in the alley, but there is no video footage in the alley itself. The evidence collectively pointed to appellant, wearing a gray sweatsuit and black ski mask, and the other juvenile, wearing a black sweatsuit and no mask. Soon after the shooting the police located these juveniles inside a residence within walking distance of the murder scene and who matched the witness and video descriptions for their clothing, shoes, hair, and size. In particular, the police retrieved from the residence the gray sweatsuit and black ski mask, which was confirmed by the state crime lab to contain appellant's DNA.

**{¶ 7}** Appellant and the other juvenile had arranged a weapons transaction with the victim, where they would sell the other juvenile's Glock 19 gun to the victim in exchange for two guns from the victim, a pink SCCY 380 gun and another pistol. Rather than complete the transaction, appellant and the other juvenile apparently decided to rob the victim and before they arrived at the carryout together, appellant split off to go directly to the alley while the black-sweatsuit-wearing juvenile entered the carryout. The investigating detective testified that the condition of the cash found at the murder scene, as if it had been grabbed with a fist to crumple it and shove it into a pocket where some fell out, was identical to the condition of the cash found in the residence where appellant was located. The detective also testified that the Glock 19, which was the item to be sold to the victim, was found in the residence after the murder.

**{¶ 8}** The detective summarized the evidence from the area surveillance videos and witness statements as follows:

> We pick up [the black-sweatsuit-wearing juvenile] going to the store and then meeting [the victim]. The other [gray-sweatsuit-with-black-ski-mask-wearing] individual is walking down Burnham in the same direction at the same time and ends up in the alley per witness statements and [was] waiting there and then moves when the witness is by him, and then [the victim] and [the black-sweatsuit-wearing juvenile] go in the alley and we have our mystery black hole, then we have our two individuals again running from the alley immediately after the gunshots and fleeing back to [the residence].

**{¶ 9}** The juvenile court journalized its probable cause judgment entries on October 11, 2022. Thereafter, the juvenile court ordered a mental evaluation of appellant under R.C. 2152.12(C) and Juv.R. 30. The mental evaluation, which is sealed in the

5.

record, was performed on December 27, 2022, by a licensed clinical psychologist with the Court Diagnostic and Treatment Center. The evaluation included a thorough review of appellant's juvenile record, medical history, drug and alcohol use, education history, family and social history, work history, and the behavioral and psychological assessment tools employed. Appellant's juvenile record began at the age of 13 and continued from there leading up to when three months prior to the murder, appellant was adjudged delinquent for a firearm offense and sentenced to probation. Appellant was on probation for that prior firearms offense at the time of the murder. The report included a review of factors supporting the juvenile court retaining jurisdiction and, alternatively, factors supporting the juvenile court relinquishing jurisdiction. Ultimately, it was the opinion of the licensed clinical psychologist to a reasonable degree of professional certainty that all of appellant's juvenile court charges should be transferred to "adult court."

{¶ 10} On January 30, 2023, the juvenile court held the hearing for the second step of the transfer process, whether appellant was amenable to remaining in the juvenile justice system. Appellant disputes the juvenile court's finding that he is not amenable to remain in the juvenile justice system.

{¶ 11} The court-ordered report by the licensed clinical psychologist, labeled a confidential document, was admitted into evidence by appellee without appellant's objection. Appellee rested its case.

{¶ 12} Appellant offered, and the juvenile court heard, testimony from appellant's mother and father. Appellant's mother, a single mom who gave birth to appellant "very

6.

young," frequently referred to appellant as, "He is very mature for his age." Appellant helps with the caregiving for the other five siblings in the home, aged from one to seven years old. She described appellant as "antsy":

> So because he is -- this is how I feel, because he deals with the children and I need him to do so much, he has started to get like getting older he started to get antsy, he started to want to be his own person I believe, and being around -- like he doesn't know -- like he doesn't pick people to be around very well, so I think that that kind of made him more antsy, more like I'm impulsive because he's like I only have this much time to do this, so whatever anybody wants to do while he has a second to do it, he's going to do it, because he was just like I put so much on him in years. . . . So getting older he felt like he needed to be a little tougher, because [appellant] had to kind of learn that by himself, his dad was in jail like a lot of his life[.]

{¶ 13} Appellant offered his father's testimony. Appellant's father testified that soon after appellant's birth, he was in jail at the age of 18 and for the first ten years of appellant's life. Since the father's release, he has had to focus on his own court-ordered programs and has not been able to father appellant as he should because "I didn't even know how to be a father." Appellant's father admitted he has not been a positive male influence in appellant's life.

{¶ 14} Appellant offered his probation officer's testimony. When asked by the juvenile court, "Is there anything you would like to say?" the probation officer, Marcus Kelly, testified that he only knew appellant for two months prior to the murder.

> So I had an opportunity to work with him for roughly about two months before the incident happened. Very pleasurable. He was working at Rally's at the time. So I did witness a lot of the things that mom did share as far as him helping out in the home with the kids. I know being at the home visits, they're running around, he helped picking them up and just keeping in order.

7.

So it's unfortunate that we didn't have an opportunity to work with him a little longer because I do believe that he is a workable young man and I just hope that whatever the court decides today that they really consider the fact that he has done some work and he has shown a lot of leadership upstairs. I know I got kids who [are] out in the community who's asking about him. I don't, you know, try to talk about his case, but they continue to, you know, ask that, you know, Tay'vion keep his head up and support. So I just hope the court consider he has done some work and I just pray for him as he [goes] through this process.

{¶ 15} Relevant to appellant's first assignment of error, the probation officer did not raise the existence of any reports he authored regarding appellant, and he did not discuss any opinions expressed in those reports. Appellant did not bring these reports to the juvenile court's attention nor did he seek to introduce them as evidence at the hearing. We find the record contains three reports authored by the probation officer dated April 5, October 17, and October 18, 2022, each labeled confidential. The probation officer's testimony is consistent with his opinions expressed in those reports.

{¶ 16} Appellant then offered his own testimony to the juvenile court:

Being here at JDC has allowed me to take time to think about my life and the changes I can make. Being put in this whole situation made me see the bigger picture in life, see that my life could be over in a snap of a finger, so that everything could be over. The other two times that I came here I got slaps on the wrist, it wasn't nothing too major, nothing for me to realize that there's more to life. Being put in this situation just made me realize that like it's so much more that I could do, I got so much more potential. There's staff members upstairs that can help me a lot, Miss Jackson, she help me to find God, like she helped me a lot. They see that I'm respectful. She even asked to write a letter for me but I told her that somebody told me they don't really look at that stuff, but she even asked to write a letter for me just because she know that I'm a good kid. I just feel like I deserve a chance to right my wrongs. I want a chance to determine to the court that I can do better, that I can be better, and that I will do better. I really hope you [know] I'm sorry, I really hope you look at me as a good kid that I am and not what I'm accused of because I really am a good kid

and I hope you see that. Whenever it is that I do get out I want to leave this city and press the reset button. I want to start my whole life over. This city, I don't feel like nobody deserve to be in this city. There's so much going on and so many bad influences and so much more stuff to do and people don't understand.

Yesterday I was just in group talking to my peers and I just keep trying to encourage them to change, just encourage them to do better, encourage them to just show them that the streets is not the answer, it's no way out but dead or in jail, and they just won't listen, and I just tell them like you all don't want to be in the situation that I'm in. You all don't want to be here not knowing what is going to happen, just looking forward to court hearings and not knowing what is going to happen. You all don't want -you all going home, you all have a chance to go home, and I just tell them when you all go home just think about changing, just please think about it. If you don't listen to nobody just please listen to me and think about changing, but they don't want to listen.

It's sad that it takes -it's sad that it took me to get put in this situation to realize that I need to turn my life around, but that's just something I can't change and I just got to live through it. I got siblings that look up to me and I just hope that they don't have to see me locked away for the rest of my life. I just hope that the court give me a chance to show them better, because they really look up to me. Everything that I do my little brothers try to do. When I do good, they try to do good. When I get mad, they get mad. Somebody told me upstairs that I'm a charismatic leader, that I am an ambassador. I'm just a good person. I just, I just hope that you see me for that good person that I am please. Thank you.

. . .

Can I say one more thing? Harbor has helped me a lot also. Miss Anastasia, she come see me, she come see me every week, and she just help me to get stuff off my mind, release my problems. Just I have been good the whole time I have been here I maintained level three, but I'm not perfect, I have my moments because of what I'm going through, and she helped me to get stuff off my mind. I feel that I'm way more mature than I was when I first came in here and if you ask any staff at JDC they'll tell you that. And whenever it is I get out, I have a plan. Would you like to know my plan? . . . First, get closer with my family. Second, to stay in school. I'm -- I was behind before I got here and now I'm ahead and I'm working towards graduating early as a sophomore.

Surround myself by people doing good so I can be able to do good because I notice that when you're around people doing good, it makes you want to do good because you see what they're getting out of doing good, whatever it is that they are doing.

Concentrate on working towards a meaningful career. mechanical engineer. I want to be a I like to build stuff. I'm good at math. That's just something that I always wanted to do, and I feel like I was too young to pursue that, to pursue that, but being here I have had teachers look up stuff for me in this program that I could be in so I could be ready by the time, by the time it's time for me to be there to go to school for that or be a mechanical engineer. feel like I was too young to start pursuing that.

Stay sober. Being here I realize that I'm not the same person when I'm high. When I'm sober I have a clear mind. I'm -- everything is just thought through. I think about what I do before I do it. They call it irrational and irrational thinking upstairs and I feel like I'm, I'm a rational thinker. I think about what I do before I do it. And yeah, that's my plan.

{¶ 17} After appellant rested his case, the juvenile court stated as follows:

You are a good person, okay. That's not what this is about. . . . [M]y job is tasked to look at the code, and under the Ohio Revised Code it reads, in considering whether to transfer, the court should consider the following relevant factors, and the first factor under [R.C. 2152.12](D)(1) is the victim and what they suffered, physical or psychological harm, socioeconomic harm. Sadly the charge here, somebody lost their life Doesn't get any more serious than that, right.

I think there under [R.C. 2152.12](D)(3) there had to have been some relationship, it was as far as I can tell even from Court Diagnostic's report, it was an arranged meeting, right, so there's a relationship there. Under [R.C. 2152.12](D)(5), it involved a firearm. A firearm that on probation you weren't to be around, right.

You were court ordered, in addition to being at the time 15, ordered not to have a firearm, but yet a firearm was involved in this. And under [R.C. 2152.12](D)(6), you were actively under community control. And perhaps probation wasn't serious enough or you didn't take it serious enough, right. Because juvenile court is about rehabilitation. We don't just go to the -- we try to use the least restrictive forms of punitive sanctions to try to, I don't know, not put you in situations where you might learn worse things from other people. But you were on probation and you had at least been supervised before on the [Juv.R.] 29(F)(2)(C).

I don't know if we've had enough time to decide if juvenile sanctions would actually help. You had the 29, you came back on another gun charge, and while actively on charge ordered by the court to not have a weapon, a weapon was used, and at least there's probable cause to believe that you were there. You are per testimony per Court Diagnostics

emotionally, physically, psychologically mature enough under [R.C. 2152.12](D)( 8).

      For those reasons the court is going to transfer this to General Division. I don't want you to give up on yourself, right. Probable cause is a lot different than a finding of guilt or adjudication -- or delinquency in this court. You have a good attorney. Things can happen. Don't give up. Pursue your education. You are to remain here until the finality of the case across the street.

{¶ 18} On February 7, 2023, appellant's four offenses were transferred to the general division of the common pleas court for prosecution of appellant as an adult. The juvenile court's judgment entry, as amended, extensively reviewed the R.C. 2152.12(D) and (E) factors, which are:

      (D) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:

      (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.

      (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.

      (3) The child's relationship with the victim facilitated the act charged.

      (4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.

      (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.

      (6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

      (7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

(E) In considering whether to transfer a child under division (B) of this section based on an act charged that would be a felony if committed by an adult, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

{¶ 19} The juvenile court determined that the R.C. 2152.12(D) factors outweighed the R.C. 2152.12(E) factors to support binding appellant over to the general division for prosecution as an adult. In reaching its decision, the juvenile court found the following:

{¶ 20} Regarding R.C. 2152.12(B)(1), appellant was fifteen years old at the time of the criminal charges, which are felonies if committed by an adult. Regarding R.C. 2152.12(B)(2), the juvenile court found probable cause existed that appellant committed the acts charged. Regarding R.C. 2152.12(B)(3), the juvenile court reviewed the R.C. 2152.12(D) and (E) factors as follows:

12.

**{¶ 21}** Under R.C. 2152.12(D)(1) and R.C. 2152.12(E)(4), "The victim died as the result of being shot."

**{¶ 22}** Under R.C. 2152.12(D)(3), the juvenile court said that based on the murder resulting from an arranged meeting for a weapons transaction, "there's a relationship there."

**{¶ 23}** Under R.C. 2152.12(D)(5) and (6) and under R.C. 2152.12(E)(5), "The Juvenile was on probation at the time these charges were filed, having been adjudicated delinquent for a Carry Concealed Weapon (F4) offense. He was court ordered to possess no weapons based on said adjudication." Appellant was actively under Juv.R. 29(F)(2)(c) community control/probation for that offense. For appellant's current charges, "Guns were relevant in this incident, as a trade was the underlying reason for the parties to be together on the date and time of the incident." For appellant's current adjudication and detention, "The Juvenile has been in the Juvenile Detention Center and he has been doing relatively well in detention."

**{¶ 24}** Under R.C. 2152.12(D)(7) and under R.C. 2152.12(E)(5), "the Juvenile had been granted a Rule 29(F)(2)(c) dismissal on a Burglary (F2) offense by the Court in 2021. He was 13 at the time of his arrest on this charge."

**{¶ 25}** Under R.C. 2152.12(D)(8) and under R.C. 2152.12(E)(6) and (7):

> A diagnostic evaluation was conducted by Mitchell Hicks, PhD, ABPP of the Court Diagnostics and Treatment Center on December 27, 2022. A report by Dr. Hicks was submitted to the Court on January 9, 2023. The Juvenile presented as an individual with at least average intelligence, with no observed deficiencies in processing speed or abstract reasoning. The Juvenile is in the tenth grade and had accumulated six credits in his

13.

freshman year with a 2.0 grade point average. The Juvenile was employed at Rally's shortly before being arrested on the current charges. The Juvenile has had sleep issues since he was little. The Juvenile has been prescribed Loratadine (10 mg) for seasonal allergies, Zoloft (50 mg) for anxiety/depression and Clonidine (0.2 mg) for his sleep issues. The Juvenile was diagnosed with Unspecified Anxiety Disorder and Major Depressive Disorder. Further testing would need to be undertaken for a diagnosis of Attention-Deficit/Hyperactivity Disorder (ADHD). The Juvenile's parents, Brittany Williams and Manta Price both testified on Tay'Vion's behalf. Both parents spoke to his positive attributes. Both parents testified as to the maturity of Tay'Vion, finding him to be a mature young man.

**{¶ 26}** Under R.C. 2152.12(D)(9) and R.C. 2152.12(E)(8):

Dr. Hicks found that to a reasonable degree of professional certainty that this matter should be transferred to the Adult Court for the following reasons: A. The Actions taken resulted in murder by firearm; B. Tay'Vion Price was already on Probation for another gun related charge and has completed a previous term of juvenile probation; and C. There is no clear link between his mental health symptoms and the alleged actions.

**{¶ 27}** After the bindover to the general division of the common pleas court, on March 16, 2023, a Lucas County grand jury indicted appellant for: one count of aggravated murder, a violation of R.C. 2903.01(B) and (G) with specification under R.C. 2941.145(A), (B),(C), and (F); one count of murder, a violation of R.C. 2903.02(B) and 2929.02 with specification under R.C. 2941.145(A), (B),(C), and (F); one count of felonious assault, a violation of R.C. 2903.11(A)(2) and 2903.11(D) with specification under R.C. 2941.145(A), (B),(C), and (F); and one count of aggravated robbery, a violation of R.C. 2911.01(A)(1) and 2911.01(C) with specification under R.C. 2941.145(A), (B),(C), and (F).

14.

{¶ 28} Appellant pled not guilty to all charges and the matter proceeded in anticipation of a trial on November 27, 2023. On November 21, appellant changed his plea to guilty to murder, a violation of R.C. 2903.02(B)[2] and 2929.02, which outlines the penalties for murder. Appellant's signed plea agreement is in the record. As explained in the trial court's journalized entry, "State of Ohio to nolle the attached firearm specification and all remaining counts and attached firearm specifications at the time of sentencing." After an extensive plea colloquy, the trial court accepted appellant's guilty plea as knowingly, voluntarily, and intelligently made and found appellant guilty of murder.

{¶ 29} Appellant gave the following account of the events on June 14, 2022:

> A: Me and my co-defendant -- my co-defendant asked me to go to an alley with him for a gun deal. We went, and we was in the alley. Something went wrong and the gun deal went wrong and shots got fired.
> COURT: All right. And shots got fired. You had a firearm in your hand?
> A: Yeah.
> COURT: And your gun was fired, correct?
> A: Yes.
> COURT: All right. And the bullet from your gun struck the third individual, not your co-defendant, but the other individual who ended up dead, is that correct?
> A: Yes.
> COURT: All right. And do you know who that person was?
> A: No.
> . . .

---

[2] R.C. 2903.02(B) states, "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C. 2903.03 or 2903.04]."

COURT: Mr. Price, the individual that was shot and who died in the alley that day, his last name was Mr. Walker. Did you know him prior to being in the alley?

A: No.

COURT: Is that who you know to have been shot in the alley is a gentleman by the name of Walker?

A: Yes, that's what I was just told.

COURT: All right, and the bullet that killed him came from the gun that was in your hand, correct?

A: Yes.

. . .

COURT: And Mr. Price, the location where Mr. Walker was found that's where you were supposed to be meeting to have this gun deal, is that correct?

A: Yes.

{¶ 30} At the December 18, 2023 sentencing hearing, after the trial court received and reviewed the presentence investigation report and the defendant's sentencing memorandum in which he requested sentencing "in compliance with the applicable statutes and agreement outlined in the plea agreement that was entered into by the State of Ohio and the Defendant," the trial court sentenced appellant pursuant to R.C. 2929.02(B)(1) to an indefinite term of 15 years to life, or life imprisonment with parole eligibility after 15 years, for the murder conviction. Appellant timely filed this appeal.

## II. Standard of Review for R.C. 2152.12(B)(3)

{¶ 31} In support of his first assignment of error, appellant argues the juvenile court abused its discretion when it ordered the discretionary transfer of jurisdiction to the general division under R.C. 2152.12(B), citing *State v. Nicholas*, 2022-Ohio-4276, ¶ 22. We agree that our review of the juvenile court's decision is for an abuse of discretion. An abuse of discretion occurs when the juvenile court exercises its judgment, in an

unwarranted way, regarding a matter over which it has discretionary authority. *Halbeisen v. Fantozz*, 2023-Ohio-4340, ¶ 7 (6th Dist.), citing *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35.

{¶ 32} Appellant does not dispute the juvenile court's findings under R.C. 2152.12(B)(1) and 2152.12(B)(2), but disputes the findings under R.C. 2152.12(B)(3). Appellant argues, citing *Nicholas* at ¶ 29, that R.C. 2152.12(B)(3) establishes a preponderance-of-the-evidence standard for the juvenile court's weighing the R.C. 2152.12(D) versus 2152.12(E) factors when deciding appellant's amenability to treatment and rehabilitation in the juvenile justice system. The Ohio Supreme Court explains that a preponderance-of-the-evidence means the greater weight of evidence and only necessary to destroy the equilibrium. *Id.* In addition, the Ohio Supreme Court recently settled the question of "the quantum of evidence that satisfies the probable-cause standard for deciding whether a juvenile offender may be bound over to adult court." *In re E.S.*, 2023-Ohio-4273, ¶ 1. Appellee meets this burden if it has produced evidence that raises more than a mere suspicion of guilt. *Id.* "To require more of the state is error." *Id.*

{¶ 33} Despite the foregoing, appellant mistakenly argues the juvenile court abused its discretion when it failed to consider the court probation officer's written report favorable to him, which opined appellant was a "low risk," a "7" out of an unidentified scale. Appellant argues the juvenile court had the burden to bring into the evidentiary hearing the probation officer's written report, citing *State v. Ellis*, 2022-Ohio-147, ¶ 4 (2d Dist.) (under Juv.R. 30(C) and R.C. 2152.12(C), the juvenile court ordered a mental

17.

examination report by the court-ordered psychologist and a report and recommendation by the court-appointed guardian ad litem). The *Ellis* court emphasized the importance of having court-ordered reports in the record. However, appellant fails to show both where in the record, on the one hand, the juvenile court ordered the probation officer to produce his written report and where, on the other hand, the juvenile court ignored the court-ordered report by the licensed clinical psychologist, Dr. Hicks with Court Diagnostic & Treatment Center.

{¶ 34} To take the analysis further, on the one hand, the probation officer's report, which the court did not order in the record to be prepared for it but is in the record, did not arrive at an opinion with a reasonable degree of professional certainty that appellant is amenable to treatment and rehabilitation in the juvenile justice system. Nevertheless, appellant's probation officer testified with his opinion that appellant is "a workable young man" given "an opportunity to work with him a little longer." Appellant simply concludes, "Notwithstanding Officer Kelley's favorable oral statement at the hearing, the court in fact makes no mention at all of the report or Officer Kelley's written assessment."

{¶ 35} On the other hand, the court-ordered mental health evaluation by the licensed clinical psychologist is in the record and he opined, to a reasonable degree of professional certainty, that appellant should be boundover for prosecution as an adult. Appellant mistakenly argues Dr. Hicks' report "does not mention Ohio's statutory factors once." Prior to reaching his bindover opinion to a reasonable degree of professional

18.

certainty, Dr. Hicks' report addressed the R.C. 2152.12(D) and (E) factors when he outlined in his report a section describing, "factors that favor [appellant's] case being waived to adult court" and another section describing "factors that do not favor waiver to adult court."

{¶ 36} We find the record contains a preponderance of evidence for the R.C. 2152.12(B)(3) amenability phase of the juvenile court's decision demonstrating the R.C. 2152.12(D) factors favoring transfer destroyed the equilibrium analysis with R.C. 2152.12(E) favoring non-transfer. Appellant chastises the juvenile court for mentioning "only 5 of these factors," which raises questions about how appellant is counting them. Nevertheless, the juvenile court was not required to consider each factor to appellant's satisfaction, nor does R.C. 2152.12(B)(3) hold any particular factor, such as R.C. 2152.12(E)(8), above all other factors. All that is required is consideration itself. *State v. Cunningham*, 2022-Ohio-3497, ¶ 100 (6th Dist.) ("As long as the juvenile court considered the factors in the statute and the record contains some rational basis to support the court's findings, we will not find that the court abused its discretion.") The juvenile court has discretion to decide how much weight to give each factor in R.C. 2152.12(D) and (E), and the juvenile court is not required to individually analyze every possible avenue for appellant's treatment and rehabilitation when deciding that he was not amenable to them. *Id.* at ¶ 103. Moreover, the Ohio Supreme Court has explicitly rejected appellant's argument: "We further hold that a juvenile court need not consider all potential juvenile dispositions, including a serious-youthful-offender disposition, when

19.

balancing the factors weighing in favor of and against transfer." *Nicholas*, 2022-Ohio-4276, at ¶ 57.

{¶ 37} We do not find the juvenile court abused its discretion. The juvenile court did not exercise its judgment in an unwarranted way when it decided to "bindover" appellant from the juvenile court to the "adult court."

{¶ 38} Appellant's first assignment of error is not well-taken.

### III. R.C. 2929.02(B)(1) Sentencing

{¶ 39} We will address appellant's second and third assignments together as they collectively challenge his mandatory sentence under R.C. 2929.02(B)(1) after pleading guilty to murder. R.C. 2929.02(B)(1) states in relevant part, "[W]hoever is convicted of or pleads guilty to murder in violation of [R.C. 2903.02] shall be imprisoned for an indefinite term of fifteen years to life."

{¶ 40} Appellant argues for his second assignment of error that R.C. 2929.02(B)(1) mandating a life sentence with the possibility of parole after 15 years for committing murder violates his constitutional rights as a juvenile. Appellant argues that where R.C. 2929.03, aggravated murder, requires the sentencing court to separately consider and articulate appellant's youth as a mitigating factor before imposing a life sentence, citing *State v. Patrick*, 2020-Ohio-6803, ¶ 51 (Donnelly, J. concurring), then the same must occur under R.C. 2929.02(B)(1). However, "[u]nder R.C. 2929.02(B) there is simply no room to make this individualized assessment of youth and its defining features." Appellant concludes that R.C. 2929.02(B)(1) is unconstitutional because

20.

children and adults are treated exactly the same at sentencing, and "It is incumbent upon this court to say so."

{¶ 41} We disagree. The Second, Seventh, Eighth, and Twelfth District Courts of Appeals have addressed and rejected this identical argument, and we hereby adopt their reasoning. *State v. Starling*, 2019-Ohio-1478, ¶ 62-70 (2d Dist.); *State v. Carlock*, 2021-Ohio-4550, ¶ 9-27 (7th Dist.); *State v. Miree*, 2022-Ohio-3664, ¶ 96 (8th Dist.), *aff'd,* 2024-Ohio-5714; *State v. Fuell*, 2021-Ohio-1627, ¶ 62-76 (12th Dist.), *appeal dismissed* 2022-Ohio-1607. We find that appellant's failure to raise this constitutional issue with the trial court waived all but plain error, and upon review we find appellant has presented no plain error that is so obvious for which a reversal is required to correct a manifest miscarriage of justice. Appellant conflates his sentence under R.C. 2929.02(B)(1), for murder, to be under R.C. 2929.03, for aggravated murder, which is not true, and the legal authorities he cited did not indicate their holdings on life-imprisonment-without-parole have been extended to a sentence of life-imprisonment-with-parole-eligibility-after-15-years. There is no constitutional violation where appellant's life sentence is subject to a meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation after 15 years, when appellant will be 30 years old. *See State v. Moore*, 2016-Ohio-8288, ¶ 47; *see also Patrick* at ¶ 35 (finding parole eligibility after 33 years in one's 50s is not a meaningful opportunity to obtain release).

{¶ 42} Appellant's second assignment of error is not well-taken.

21.

{¶ 43} Appellant argues for his third assignment of error that R.C. 2929.02(B) directly conflicts with R.C. 2929.19(B)(1)(b), such that R.C. 2929.19(B)(1)(b), requiring the sentencing court to consider youth and its characteristics as mitigating factors, must prevail. Appellant urges us, under R.C. 1.47 and 1.52(A), to "repeal by implication" R.C. 2929.02(B), which is the older statute. Appellant insists that *Miller v. Alabama*, 567 U.S. 460 (2012), *State v. Long*, 2014-Ohio-849, and *Patrick* at ¶ 48. will remain "unsatisfied," until this court disposes of R.C. 2929.02(B) as unconstitutional. We disagree, as *Miller* and *Long* are distinguishable for their holdings regarding a juvenile's life-sentence-without-parole, and *Patrick* is distinguishable for the duration of mandatory incarceration for aggravated murder before parole eligibility.

{¶ 44} The Ninth District Court of Appeals addressed and rejected a nearly identical argument, and we agree with its reasoning. *State v. Shepherd*, 2024-Ohio-4618, ¶ 7-11 (9th Dist.). The *Shepherd* court found no plain error when the trial court sentenced the juvenile under R.C. 2929.02(B)(1) for murder without considering his youth under R.C. 2929.19(B)(1)(b). We find that appellant's failure to raise this issue with the trial court waived all but plain error, and upon review we find appellant has presented no plain error that is so obvious for which a reversal is required to correct a manifest miscarriage of justice. Moreover, we agree with the *Shepherd* court and *State v. Grevious*, 2022-Ohio-4361, ¶ 31, that where the sentence for murder under R.C. 2929.02(B)(1) is explicitly authorized by law, was jointly agreed to by the parties and understood by

22.

appellant prior to imposition of the sentence, and was actually imposed by the trial court, it is unreviewable under R.C. 2953.08(D)(1).

{¶ 45} Even if we were to find that R.C. 2929.19(B)(1)(b), applied to the trial court imposing the sentence for appellant's murder conviction, the record includes the pre-sentence investigation report, social, work and family history, school reports, police reports, juvenile probation reports, the court's discussion of appellant's juvenile justice history, and a forensic evaluation that went into detail about appellant's psychological and medical health and his maturity level compared to his peers. In view of the entire record, we cannot say that the record affirmatively demonstrates that the court failed to consider the R.C. 2929.19(B)(1)(b) factors. *See State v. Moore*, 2024-Ohio-5839, ¶ 15 (2d Dist.).

{¶ 46} We also find that R.C 1.51 helps to resolve any alleged irreconcilable conflict appellant claims to exist between R.C. 2929.02(B)(1), the older, specific penalty for murder, and R.C. 2929.19(B)(1)(b), the newer, general sentencing considerations of juvenile offenders. *See State v. Watson*, 2023-Ohio-1469, ¶ 51 (5th Dist.), *appeal not allowed,* 2023-Ohio-4034. "If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision, unless the general provision is the later adoption and the manifest intent is that the general provision prevail." R.C. 1.51. Appellant provides nothing to support his argument that the General Assembly expressed a manifest intent for the general sentencing provisions of R.C.

23.

2929.19(B)(1)(b) to prevail over the specific murder-penalty statute, R.C. 2929.02(B)(1). We do not find those statutes are irreconcilable.

{¶ 47} In contrast, appellee points to R.C. 2929.02(C), enacted concurrently with R.C. 2929.19(B)(1)(b), as evidence of the legislature knowing when to express its intent to prevail over juvenile-murderer sentencing under R.C. 2929.02(B)(1). However, the General Assembly did not destroy the underlying integrity of a life sentence with parole eligibility after 15 years under R.C. 2929.02(B)(1). We are guided by R.C. 1.52(B) to harmonize the legislature's amendment to R.C. 2929.02(C) and existing R.C. 2929.02(B)(1) to give effect to each.

{¶ 48} Under R.C. 2929.02(C), appellant's parole eligibility shall be determined under R.C. 2967.132. In turn, R.C. 2967.132(B) states it applies to any prisoner, such as appellant, serving a prison sentence for an offense committed while a juvenile, "[r]egardless of whether the prisoner's stated prison term includes mandatory time." Then R.C. 2967.132(C)(1) states that for a violation of R.C. 2903.02, appellant is eligible for parole after serving 18 years in prison. R.C. 2967.132(C)(1) further states," this section shall apply automatically and cannot be limited by the sentencing court." Here, appellant is eligible for parole after 15 years under R.C. 2929.02(B)(1), which fully complies with R.C. 2967.132(C)(1).

{¶ 49} Appellant's third assignment of error is not well-taken.

24.

## IV . Conclusion

{¶ 50} On consideration whereof, we find that substantial justice has been done in this matter. The judgment of the Lucas County Court of Common Pleas, General Division, is affirmed.  Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Christine E. Mayle, J.

Myron C. Duhart, J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.